WILLIAM DANZER & COMPANY, INC., ET AL. *v.* WESTERN MARYLAND RAILWAY COMPANY.

[No. 34, January Term, 1933.]

449

*Decided March 22nd, 1933.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Charles Markell* and *S. Ralph Warnken,* with whom was *Bruce C. Lightner* on the brief, for the appellants.

*Eugene S. Williams* and *Rowland K. Adams,* with whom was *William C. Purnell* on the brief, for the appellee.

OFFUTT, J,. delivered the opinion of the Court.

On or about February 4th, 1931, William Danzer & Co., Incorporated, herein called Danzer Company, owned a tract of ground adjacent to the right of way and tracks of the Western Maryland Railway Company, herein called railway company, between Madison and Antietam Streets, in Hagerstown, Maryland, on which it operated a general lumber business. The property was improved by a mill, sheds, an office building, and other structures, and on it were three sidings, connecting it with the tracks of the railway company. On or about the date aforesaid these buildings were damaged or destroyed by a fire said to have originated in a collision between an engine operated by the railway company and one of its cabooses which contained a "live fire," and which it had placed on one of these three sidings or spurs. The loss caused by the fire was partly covered by insurance, and, after the insuring companies had paid to the Danzer Company the amounts due under their policies, they united with it in an action in the Court of Common Pleas of Baltimore City against the railway company, to recover the loss which they and the Danzer Company had respectively suffered as a result of the fire on the ground that such loss had been caused by the defendant's negligence.

On January 9th, 1932, the railway company filed in the Circuit Court of Baltimore City its bill of complaint against the plaintiffs in the action in the Court of Common Pleas, in which it asked that they be enjoined from prosecuting the same because, it said, the Danzer Company's predecessors in title had agreed to release it from any liability for any loss from fire caused by its locomotives, cars, or engines; that the Danzer Company with knowledge of these agreements had adopted and ratified the same; that it was therefore estopped from prosecuting the action; and that, since it was estopped, it had no rights to which the insurance companies, claiming as its subrogees and through it, could be subrogated, and that that defense was not cognizable in a court of law.

The basic facts out of which that defense arises are these:
On March 26th, 1908, George, Hobbs & Fogtman, a part-

nership, who then owned the property, applied to the Western Maryland Railroad Company, predecessor of the Western Maryland Railway Company, for the construction of a spur or siding connecting their property with the railroad company's tracks. The railroad company granted the application upon terms and conditions contained in a written agreement, herein called Agreement No. 1. Under that agreement the cost of the improvement was first to be paid by the applicant, but to be repaid by the railroad company at the rate of two dollars per car consigned to or received from the applicant's plant, and, when such payments equaled the cost of construction "so as to vest title to said side tracks and coal bins" in the railroad company, the applicant should have a revocable license to use the same. Among others the agreement contained these provisions:

"The first party shall have the right to use without cost the whole or any part of said side track in connection with other business than that of the said second party, when the said side track is not occupied by the said second party, * * * (The party of the first part being the railroad company, and the party of the second part, the partnership.) And the said second party further agrees that it will indemnify, protect, and save harmless said first party against loss and damage or expense by fire to cars and their contents standing upon said side track or coal trestle which have been placed there for use of said second party.

"And the said second party releases said first party from all claims of whatsoever character for damages resulting to the property of said second party by reason of fire originating from the engines and locomotives of the first party and resulting in the burning or destruction of or injury to the property of the second party

"This agreement shall be binding upon the successors, heirs, executors, administrators and assigns of the respective parties hereto.

"And in case the second party shall assign or lease or otherwise convey the property with which said siding and coal bins are connected, written notice

thereof shall be given to the first party and the first party shall not be under any obligation to switch on said side track or coal trestle, carloads, consigned to or from such assignee, lessee, or grantee, until such assignee, lessee or grantee shall have accepted in writing all the provisions of this contract."

In May, 1908, George, Hobbs & Fogtman sold and conveyed the property to the West Side Lumber & Door Company, a corporation, and it applied to the Western Maryland Railway Company, which had succeeded the Western Maryland Railroad Company, for the construction of a second siding on its property. That application was granted and the siding constructed under an agreement similar in its material particulars to Agreement No. 1.

Thereafter the West Side Lumber & Door Company leased a part of the property to the Oak Hill Lumber Company, and in 1914, upon the application of that company, a third siding was constructed by the railway company under an agreement of the tenor and substance of Agreement No. 1, in which the lessor as owner of the fee joined.

In November, 1920, the E. H. Shreiner Lumber Company succeeded to and acquired all the rights and obligations of the Oak Hill Lumber Company. On May 9th, 1925, after the lease to the Oak Hill Lumber Company had expired, receivership proceedings were instituted against the West Side Lumber & Door Company, in the course of which the receivers conveyed its property to Charles M. Danzer and Charles S. Lane, who conveyed it to the Maryland Lumber & Millwork Corporation. In the meantime the railway company and its predecessor had repaid the cost of constructing the sidings, and title to the same had become vested in it. The Maryland Lumber & Millwork Corporation desired the reconstruction and relocation of the Oak Hill Lumber Company siding, and also to take title to the three sidings, and, to effect that purpose, in March, 1926, entered into an agreement with the railway company which recited the preceding agreements to which we have referred, and that each of the parties had

succeeded to the rights of its predecessors. The effect of that agreement was to vest title to the sidings in the lumber company, and it contained use and release clauses similar to those found in the preceding agreements. All of these agreements contained a clause that they should bind "the successors, heirs, executors, administrators and assigns of the respective parties thereto."

As a result of receivership proceedings instituted in March, 1928, all the property of the Maryland Lumber & Millwork Company was sold and conveyed to William Danzer & Co., Incorporated, its present owner, subject to a mortgage dated September 22nd, 1925, the principal and interest of which amounted to $50,762.89, to the Maryland Surety & Trust Company. William A. Danzer, president of William Danzer & Co., Incorporated, was also president of the Maryland Lumber & Millwork Corporation when it executed the agreement with the railway company, and executed the same as its president, and he occupied the same position at the time of the receivership.

Inasmuch as the sole purpose of the bill is to prevent the defendants from invoking the aid of the only tribunal which under our Constitution and laws is competent to try the issue, to determine whether the fire which caused the loss of which it complains was caused by the negligence of the Western Maryland Railway Company, for the purpose of this proceeding that corporation necessarily concedes and assumes that such loss was occasioned by its negligence, so that that question, as a question of fact, is not in issue here.

It also appears from the bill that, in part at least, it is based upon the assumption that the knowledge of William A. Danzer of the several agreements to which reference has been made is imputed to William Danzer & Co., Incorporated, of which he is the president.

The defendants in their answer deny that the personal knowledge of William A. Danzer is to be imputed to William Danzer & Co., Incorporated, and deny that it had any knowledge of said agreements, and further deny that it is in any way bound by them to release the plaintiff from the loss

occasioned by the fire caused by plaintiff's negligence. They further state that, at the time of the collision which caused the fire, the defendants' engine and caboose which collided occupied the said siding in violation of said agreements, were stored there for purposes having no relation to the business of William Danzer & Co., Incorporated, or any person served by said siding, and further alleged that it had repeatedly protested against such use of its property, but that the "fire was the direct result of unlawful, unauthorized use by the plaintiff of Danzer Company's property, not for the purpose of receiving and delivering freight for Danzer Company or even for other shippers, but for continuous storage and shifting of cabooses. In this way Danzer Company's property was virtually converted into a railroad yard, not for the business of transportation but for the ultra-hazardous storage and shifting of cars and cabooses awaiting use." They further allege that said loss was not only due to the negligence of the plaintiff in originating it, but also to its negligence in failing to arrest and extinguish it. And finally they say that the defense set up in the bill is cognizable in a court of law, that this proceeding is vexatious and dilatory, and not in good faith.

The case was tried upon those issues of law and fact, and after a hearing and argument the court signed a decree in which (1) it granted a perpetual injunction as prayed in the plaintiff's bill, (2) ordered William Danzer & Co., Incorporated, to execute and deliver a release to the plaintiff "in accordance with the provisions of the agreement" with the Maryland Lumber & Millwork Company of 1926, and (3) reserved to the defendants the right "to petition this Court on or before thirty days from the date hereof, for permission to apply to the Court of Common Pleas of this City for leave to amend the declaration in the suit herein between parties hereto, referred to in these proceedings; so that when so amended, the declaration will declare on the breach of duty, if any, the Plaintiff owed William Danzer and Company, Incorporated, which duty that Company contends required, the employees of the Plaintiff, as soon as they had notice of

the fire named in such declaration, and while it was within their power so to do, to use reasonable efforts to reduce the damage to that Company's property, by preventing the spread of the fire and extinguishing it, as soon as they could do so by such efforts, copy of such declaration to be served on any Counsel for the Plaintiff, with leave to it to answer within fifteen days." From that decree the defendants took this appeal.

The appeal as argued in this court presents three questions: (1) Whether William Danzer & Co., Incorporated, is bound by the agreements of its predecessors in title releasing the plaintiff from liability for fires caused by its engines, cars, or locomotives; (2) if it is, do such agreements cover losses from fire caused by the use by the plaintiff of the sidings on William Danzer & Co., Incorporated, land for purposes of its own, not connected with the business of the Danzer Company or of any person served by said sidings; and (3) whether they cover the negligence of the plaintiff in failing to extinguish the fire after it had notice thereof and an opportunity to do so.

*Adamstown Canning & Supply Company v. Balto. & O. R. Co.,* 137 Md. 199, 112 A. 286, is authority for the proposition that, if Danzer Company, with knowledge of the agreements, adopted and accepted the terms thereof, and accepted and used the services of the appellee given under them, it is bound by them. For in that case the court says: "If, as stated in these averments, the defendant, with full knowledge, adopted and accepted the terms of said agreements as the conditions and terms upon which it was to receive and enjoy the benefits of said siding, and the plaintiff should continue to use and operate the same, and the plaintiff, in consideration of such adoption and acceptance, did not revoke or rescind said agreements, but continued to use said siding and to render the defendant said service, the defendant cannot, after inducing the plaintiff to render the service upon the conditions specified, and after receiving the benefits of services rendered upon those conditions, refuse to comply with

its obligations under the agreements." *Id.,* 137 Md. 209, 112 A. 286, 289.

It is conceded that the contracts were made and that the appellee rendered Danzer Company services of the same character as those rendered its predecessors, so that the issues of fact are (1) whether William Danzer & Co., Incorporated, had "full knowledge of the terms of the agreement," and (2) whether with such knowledge it adopted and accepted them.

There can be no doubt that William A. Danzer, as president of the Maryland Lumber & Millwork Company, had full knowledge of the contracts, and it is also true that he is, and has been, since it acquired the property, president of the Danzer Company, that he holds about ninety per cent. of its common stock and is one of its directors. The appellee contends that, because of his relation to the Danzer Company, the personal knowledge which he acquired through his connection with the Maryland Lumber & Millwork Company must be imputed to the Danzer Company, on the theory that it is "merely the *alter ego*" of Danzer. But the evidence does not support that contention. Danzer does hold ninety per cent. of the capital stock of the corporation, is its president, and one of its directors. But those facts do not merge the identity of the corporation with his. It has other stockholders, other directors, and other officers holding common and preferred stock. It was incorporated as an independent entity by the State, and functions as such, and it is in fact separate and distinct from Danzer as from its other stockholders. There are cases, of course, in which the corporation is used as a mere shield or name for the perpetration of a fraud, in which the courts will look beyond the corporate fiction to the realities which it screens, but this is not such a case, and here Danzer and the Danzer Company must be regarded as separate and distinct.

The general rule in such a case is that the knowledge of an officer of the corporation, obtained while acting outside the scope of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation.

*Fletcher Cyc. Corp.*, sec. 2218 *et seq.*, note 70, sec. 2219 *et seq.; Lohmuller Bldg. Co. v. Gamble*, 160 Md. 538 *et seq.*, 154 A. 41, and cases there cited. The inquiry therefore is whether the knowledge which Danzer had as an officer of the Maryland Lumber & Millwork Company was acquired within the scope of his duties as an officer or employee of William Danzer & Co., Incorporated. It is suggested that the fact that he personally loaned money to the millwork company identified it with the Danzer Company. But while we attach no importance to that circumstance, it further appears that, while Danzer was president of both corporations, the Danzer Company sold on conditional sales contracts to the millwork company valuable machinery, that J. Frank Highlands, secretary and treasurer of the Danzer Company, by a resolution of the Danzer Company, "was to take charge of lumber sales of the Maryland Lumber & Millwork Corporation and that his salary was to be paid by them," and that his salary from the Danzer Company was to be discontinued, and that on February 25th, 1929, the Danzer Company wrote the real estate office of the appellee in reference to the sale of a lot of ground, and in the letter stated that: "We have been looking over our records here see if we had any plans that would portray this piece of ground and we find the sketch made by your company ♯A 3149 which will give you fair idea of just what land is being offered and its location." The plat referred to was attached to the agreement of March 1st, 1926, and in respect to it Danzer testified: "You don't know of any duplicate copies? You never had any occasion to acquire any that you know of, had you? As far as you know the only copy of that plat that ever came into possession of the Maryland Lumber & Millwork Corporation or William Danzer & Company, Incorporated, was the copy that was attached to a copy of the agreement of March 1st, 1926, between the Maryland Lumber and Millwork Corporation and the Western Maryland Railway Company, that is correct, isn't it? A. Judging from its number that seems to be correct." Taken together these facts are sufficient to support the inference that the knowledge which Danzer had of the

agreement of March 1st, 1926, which recited the prior agree-ments, was used by Danzer Company, after it had acquired the property, for its own proper corporate purposes, and must therefore be imputed to it.

By comparing them it appears that the agreement of March 1st, 1926, differs in its terms and conditions from those which preceded it to such an extent that they must be treated as merged in it or superseded by it, and the rights of the parties to this proceeding and in respect to it, must be meas-ured by that agreement unaffected by those which preceded it.

It is also established that the Danzer Company received and enjoyed the benefits of the services which the appellee was to render under that agreement, and that it is for that reason bound by its terms. *Adamstown Canning & Supply Co. v. Balto. & O. R. Co., supra.*

The second question is whether, under the agreement of March 1st, 1926, the Danzer Company released the appellee from liability for loss by fire caused by the negligent opera-tion, maintenance, or storage of its cars, engines, or locomo-tives, while on Danzer Company's sidings for purposes unre-lated to its business or that of others served by the sidings.

Without analyzing it in detail, it is sufficient to say that the evidence clearly establishes the fact that the appellee had for some time, prior to the fire, over the Danzer Company's protests, used its sidings to store cabooses and freight cars for purposes which had no possible connection with the Danzer Company, or any other person served by such sidings.

In describing that use William A. Danzer testified: "Dur-ing the night they used the yard to shunt their old broken down cars in and their cabooses and anything they wanted, and they would hit these cars that were already spotted and drove them out of the way, the next morning when we would go to load the men would have to stand around there idle because the car was not placed at the proper spot, and we would frequently take a big White truck we had there and drag the cars back up to the place where they were before they knocked them down the line. * * * Just what did they begin

doing there in the spring of 1929? A. They began to switch their cabooses in there, and not only that but ditcher was set in our yard together with the camp cars. There was fire in the camp cars for a good long while. * * * What were the cabooses doing there, five cabooses on your property at one time? Were they connected with trains? A. No, they would be switched in there, sometimes on one siding and sometimes on another and sometimes blocks of two or three together; sometimes a single one here and a few others somewhere else. * * * I believe they call number three the third track leading to the shed, and number two into the heart of the property and number one, but I have seen cabooses on number one also. Q. Number one and two both? A. Yes, and three. Q. Without any connection with any trains? A. Yes. Q. Without any connection with your business? A. No. Q. Or any other customer? A. No. Q. Just used as a railroad yard? A. Just a railroad yard." And he added that such use continued up to the fire.

Referring to the same use William R. Ingram testified: "While the tracks were used for our own use, that is, unloading the cars and loading cars, the Western Maryland Railway Company would use it as storage for their Cumberland cabooses, and also store ditcher and cars, camp cars, along on number two tracks. Q. Did they make general use of your side tracks? A. Yes, sir. Q. For their own purposes? A. Yes. Q. For the storage of cars? A. Yes. * * * Q. Can you tell us whether you ever gave them any warning with respect to probable fires? A. Why, yes, sir, I told a man in a camp car one time there is the ditcher on number two track, one morning, and the blaze was coming out of the stack. Q. What kind of a car? A. Camp car, where they sleep in. Q. And you told the man in charge of that? A. Yes, sir, told the man that was in the camp car. Q. What did you tell him? A. I told him they would have to be very careful or they would set the place on fire with the blaze coming out of the stack. Q. What did he do about it? A. When I went back into the engine room they must have put something on the fire and the blaze went down. Q. Have you ever observed

fires being made in cabooses that were stored on your property? A. Yes. Q. Have you ever noticed sparks coming out of the chimneys of cabooses? A. Yes, and blaze, too."

Appellee's contention is that the release clause contained in the agreement of March 1st, 1926, and quoted above, not only covered loss by fire caused by its engines, locomotives, or cars while using the siding in connection with the business of the Danzer Company or others served by the sidings, but also while using them for storing or switching its cars and engines for purposes of its own, not connected with the business of the Danzer Company or any other person served by such sidings. But while such a construction is not inconsistent with the language actually employed in the clause, considered as isolated, complete in itself, and independent of the whole agreement of which it is a part, it becomes impossible when the whole agreement, its purposes, subject, and intent are considered. The object of that, as well as the earlier agreements, was to construct sidings on the land now owned by Danzer Company to facilitate the shipment of freight over the tracks of the appellee to and from its plant. The benefits accruing from such an arrangement were mutual, the appellee received the revenue from the transportation of the freight and the Danzer Company was enabled to handle the freight shipped by rail to and from its plant more conveniently, more expeditiously, and at less expense.

Those were the objects and the reasons for the agreements, and when the several clauses thereof are read they must be read with those objects and reasons in mind; otherwise such clauses as that under consideration would be wholly unintelligible. *Amer. Law Inst., Contracts,* secs. 230, 235; *Stevens v. Clark,* 112 Md. 663, 77 A. 307; *American Bonding Co. v. U. S. Fid. & Guar. Co.,* 131 Md. 203, 102 A. 369; *Williston on Contracts,* sec. 618; *Myers v. Myers,* 153 Md. 48, 137 A. 501. It is axiomatic that in the interpretation of a contract the intention of the parties must control. Where the intention is clearly and unmistakably manifested by the language used, considered in connection with the subject matter of the contract, it will be gathered from the words used. *Buffalo*

*Pressed Steel Co. v. Kirwan,* 138 Md. 65, 113 A. 628. But where the contract is open to construction in determining its meaning, the court may consider the circumstances as the parties viewed them (*Phoenix Pad Mfg. Co. v. Roth,* 127 Md. 544, 96 A. 762), the subject matter and the surrounding circumstances. *Ess-Arr Knitting Mills v. Fischer,* 132 Md. 8, 103 A. 91.

In this case, when the subject-matter of the contract is considered, it is impossible to give the words under consideration their strict literal meaning, for if that were done the clause would amount to a release of the appellee from any claim for damages to the property of Danzer Company caused by fire originating from or caused by the engines, cars or locomotives of the appellee, wherever such property was located, even though the loss was occasioned by negligence or wanton mischief. Manifestly no such effect was intended. Nor can any fair process of reasoning support the conclusion that the parties intended that Danzer Company should release the appellee from loss occasioned by use of the sidings as a storage or switching yard over the protest of Danzer Company for its own peculiar corporate purposes which had no relation to the business of Danzer Company or any other person served by the sidings. That the appellee had no right under the agreement to so use the sidings is clearly shown by the following clause: "But the First Party shall have the right to use without cost the whole or any part of said side tracks in connection with other business than that of the Second Party, provided such use of the said side tracks will not unreasonably interfere with the business of the Second Party. And the Second Party further agrees that in the event of an emergency the First Party shall have the right to use the side tracks covered by this agreement until the emergency shall have passed." The "other business than that of the Second Party" obviously referred to the business of receiving from, or delivering to, persons other than the second party, freight over the sidings, and not to its general business. For the only reference to its general business is found in the concluding part of the clause which gives the appellee

the right "to use the side tracks" in the case of an "emergency", and then only until the emergency had passed. If it had under other clauses the right to use the sidings for its general corporate purposes when and as it saw fit, there was no occasion to grant it specifically the privilege of so using them in case of emergency.

But apart from that, the sole purpose of the agreement was to afford switching facilities to Danzer Company's plant, not to afford a storage or switching yard for appellee's engines, locomotives and cars, and that was its subject-matter. The storage of camp cars, cabooses, freight cars and engines on the property, so far from benefiting the second party, was a constant source of danger and annoyance to it, and it cannot be assumed that by the clause in question it intended to release appellee from liability for loss by fire originating in an instrumentality operated by it while in the tortious and unauthorized use of its property. The agreement further provided that the second party should keep in repair so much of the tracks as were on its property, and that in the event of its failure to do so, the appellee might refuse to operate its cars over them. Certainly it was not intended that the second party should, under penalty of forfeiting the right to service, pay for wear and tear caused by the use of the sidings by the appellee as a storage or switching yard.

It follows from what has been said that the agreement did not operate as a release of the appellee from loss suffered by Danzer Company as the result of fire originating in a car, engine or locomotive owned by the appellee, while on the sidings for purposes unrelated to the business of Danzer Company or other persons served by such sidings.

The third question presented by the appeal, whether the release covered a loss caused by the negligent failure of the appellee to extinguish a fire it had originated, is disposed of by what has been said in connection with the second question, and further reference to it is unnecessary.

The appellee, in its prayer for relief, not only asked that the appellants be enjoined from prosecuting the action in the Court of Common Pleas, but also that they be enjoined from

proceeding "further at law in the Court of Common Pleas of Baltimore City or elsewhere against complainant in said action there depending, where the said William Danzer and Company, Incorporated, for its own use and for the use and benefit of each and all of the above named insurance companies, defendants, is plaintiff and this complainant is defendant, which said action is to recover for damages resulting from loss by fire alleged in the declaration filed in such action to have been communicated from complainant's engines or cars, until a determination may be had of the matters and facts herein set forth." The decree ordered that an injunction issue as prayed; that Danzer Company execute a release "in accordance with the agreement" of March 1st, 1926, but permitted the defendants to amend their declaration so as to declare for loss sustained for the negligent failure of the plaintiff to put out the fire after it had originated it, "a copy of such declaration to be served on any counsel for the plaintiff with leave to answer it within fifteen days." The declaration in the Court of Common Pleas is defective in that it fails to aver with requisite precision that the caboose which caused the fire while on the siding was not there in connection with the business of Danzer Company or any other person served by the sidings. The effect of the injunction was to restrain the appellants not only from prosecuting that suit on that declaration, but from prosecuting any action at law anywhere to recover for loss occasioned by the fire, unless said loss was due to negligence in failing to extinguish the fire after appellee had originated it. That decree was erroneous and the bill should have been dismissed: (1) Because the pleadings in the Court of Common Pleas did not show that the action was for loss caused by a fire originated by appellee while on the sidings in connection with the business of Danzer Company or other persons served by such sidings and it cannot be assumed that that was the ground of the action, (2) because the appellants had the right either by amending the pleadings in that court or through an action elsewhere to assert their claim for loss caused by fire originated by some instrumentality in appellee's control, such as a car, engine or

locomotive, and through its negligence while in the unauthorized occupation of Danzer Company's property, (3) because the Circuit Court of Baltimore City had no jurisdiction to prescribe rules of pleading for the Court of Common Pleas.

It is therefore necessary to reverse the decree and dismiss the bill.

In view of that conclusion it becomes unnecessary to consider the effect of the injunction on the rights of the Maryland Surety & Trust Company, mortgagee.

*Decree reversed and bill dismissed, with costs to the appellants.*