**PHOENIX SAVINGS AND LOAN, INC.**

v.

**The AETNA CASUALTY AND SURETY COMPANY.**

Civ. A. No. 15470.

United States District Court
D. Maryland.

July 6, 1966.

466

Herbert H. Rosenbaum and Martin A. Ferris, III, Baltimore, Md., and Clarence W. Sharp, Towson, Md., for plaintiff.

Elmer W. Beasley, Hartford, Conn., Alexander M. Heron and Preston C. King, Jr., Washington, D. C., and William B. Kempton, Baltimore, Md., for defendant.

## MEMORANDUM OPINION AND ORDER

NORTHROP, District Judge.

Plaintiff, Phoenix Savings and Loan, Inc., is the successor to Phoenix Savings and Loan Association, Inc. (Phoenix). This action originally was instituted in the Circuit Court of Baltimore City, and was removed to this court by defendant Aetna Casualty and Surety Company (Aetna). Plaintiff seeks indemnity under Savings and Loan Blanket Bonds, Standard Form No. 22, Revised to September, 1960, for losses sustained by Phoenix through numerous dishonest and fraudulent acts of persons alleged to have been covered by the bonds. The bonds in question are "discovery bonds," which insure against losses, whenever sustained, if discovered during the period of the bonds' protection. Defendant has moved for summary judgment.

### I

The facts upon which defendant relies in support of its motion for summary judgment, taken from plaintiff's Declaration and from supporting documents submitted by plaintiff, may be briefly summarized as follows:

Phoenix was incorporated as a building and loan association under the laws of Maryland on or about December 29, 1958.

The following were the officers and directors of Phoenix at various times during the period December 29, 1958, to July 17, 1961:

President: Bernard J. Coven, George Gratum, Xavier F. Sutton, Donald F. Smith.

Vice President: Harry Beiles, George Gratum, Jerry Gale, Harold Brown, Arthur J. Decker, Jr. (Ass't).

Secretary: Saul Marshall, Harry V. George.

Assistant Secretary: Boris Mlawer, Saul Marshall, Margaret Pearson, Ann Longan, Evelyn Worsham, Julia George.

Treasurer: Saul Marshall, Mac Fields.

Controller: Saul Marshall.

Auditor: Saul Marshall.

Executive Committee: Bernard J. Coven, Saul Marshall, Xavier F. Sutton, Mac Fields, Dr. Howell A. King, Morris Brown, Harold Brown.

Directors: Bernard J. Coven, Michael Infante, Martin Lesser, Leon Henderson, Leo Yasskey, Herman Keller, Harry Beiles, Burton D. Fisher, Howell A. King, Saul Marshall, Stanley A. Schenck, Burton M. Gross, Harry George, Edwin Tasch, Marshall R. Diggs, Benjamin Horowitz, Boris Mlawer, S. Christian Brenneman, George Gratum, Xavier F. Sutton, Gordon H. Burlingname, Arthur J. Decker, Jr., Mac Fields, Harold Brown, Harold Brooks Mandel, Arthur Waters, Sidney London, Robert Goulet, Jr., Brig. Gen. Sam E. Dockerell, Morris Brown, Matty Simmons, Arthur C. Croft, Theodore Cohn, Leonard Mogel, Theodore R. McKeldin, Dr. Manuel Levin, Harold C. Fields, Jerry L. Gale, Robert J. Dixson, Charles Culver.

Counsel: Bernard J. Coven, Theodore McKeldin, Charles Harris, John W. Cable, III, Marvin Schein, Saul McGrane, Albert G. Aaron, James Murphy, William J. O'Donnell.

Besides being directors and officers, the following are alleged to have been employees of Phoenix as defined in the bond: Bernard J. Coven, February 10, 1959, to July 14, 1961; Saul Marshall, February 10, 1959, to July 14, 1961; Albert N. Miller, March 18, 1960, to July 14, 1961; Mac Fields, August 26, 1959, to July 14, 1961; X. F. Sutton, September 15, 1959, to July 14, 1961; Harold B. Mandel, September 15, 1959, to July 14, 1961; Howell King, November 30, 1960, to July 14, 1961; Jerry L. Gale, October 28, 1959, to July 14, 1961; Harold Brown, June 23, 1961, to July 14, 1961; Benjamin Horowitz, August 3,

1959, to April 19, 1961; George Gatum, August 3, 1959, to July 14, 1961.

Plaintiff alleges that the relationship of one Albert Miller to Phoenix was as follows:

"In March, 1960, Albert Miller * * * was employed by Phoenix as Mortgage Representative. *He alone handled the making of every mortgage loan made by Phoenix after that date.* On March 18, 1960 Coven, on behalf of Phoenix signed a letter to Miller confirming a conversation between the two that Miller was appointed Mortgage Representative of Phoenix for the Maryland—D. C. area. * * * Before Miller was employed by Phoenix no loans had been made; during the period he operated the mortgage department of Phoenix it acquired the total of 375 mortgages * * *. Miller prepared and handled all settlement sheets. Other employees have stated that Miller ran Phoenix during the period he was there—they did what he said and he had his desk in the mortgage department * * *. Miller handled all the mortgage transactions at Phoenix * * *." (Emphasis added.)

The common stock of Phoenix consisted of three classes: Class A, Class B, and Class C. Loans were only to be made to holders of Class C stock. Plaintiff alleges that the Class A and Class B common stock were

"identical in all respects except that no act of the association requiring the consent of the stockholders was valid unless it was concurred in by the holders of not less than 75% of the holders of Class B common stock. Voting power was held only by the Class A and Class B common stockholders.[1] The Class A stock was sold in the over-the-counter market and the Class B stock was *held by the 'insiders'—the minority controlling interest* * * *." (Emphasis added.)

## II

Plaintiff claims that it is entitled to indemnity from Aetna for losses resulting from numerous fraudulent transactions engaged in by officers, directors, and employees of Phoenix. The details of the alleged transactions need not be stated here, it being sufficient to remark that they extended over a long period, that they were numerous, that they involved officers, directors, employees and their cohorts, and that they were made possible because of the positions many of the perpetrators of the frauds held with Phoenix as officers, directors, and employees.

Plaintiff alleges that in many of the fraudulent transactions

"the exploitation of Phoenix by its officers and employees was carried on through [other] corporations dominated by them. In this way the 'insiders' were able to siphon off profits to their own use, diverting them from the corporation and also to hide certain of their operations * * *.

"Where these creature corporations, organized and operated by officers and employees of Phoenix, obtained profits which should rightfully have gone to Phoenix or when these officers and employees obtained 'kickbacks' out of these profits, Phoenix suffered loss covered by the bond."

From other of plaintiff's allegations it clearly appears that some of these "creature corporations" were incorporated shortly before Phoenix opened its doors for business. More significantly, among the incorporators of some of the "creature corporations" were one or more of the three organizers and promoters of Phoenix.

On the basis of the above facts, Aetna interposed a number of affirmative defenses to the plaintiff's claim for indemnity. Aetna then moved for summary judgment, claiming that the facts alleged or admitted to by Phoenix established

---

[1]. This sentence is inaccurate inasmuch as Article Seventh of the Charter provided that "each holder of Class C common stock shall have one vote regardless of the number of shares held by such holder."

Aetna's affirmative defenses as a matter of law.

Maryland law governs this diversity action. The discovery bond, being a contract, must be construed as any other contract, and cannot be extended beyond its terms. Hankins v. Public Service Mut. Ins. Co., 192 Md. 68, 63 A.2d 606 (1949). Thus, the conditions and limitations contained in the bonds are binding upon Phoenix.

The bond insured Phoenix, the corporation. Thus, it covers loss to Phoenix, not loss to customers, stockholders, or creditors. Cf. In re Schluter, Green & Co., 93 F.2d 810 (4th Cir. 1938); Fidelity & Casualty Co. of New York v. Hoyle, 64 F.2d 413 (4th Cir. 1933). Further, as defendant urges, the rights of Phoenix, the reorganized company, are no greater than the rights of the Phoenix Savings and Loan Association.

These points of law are not challenged by plaintiff. Phoenix suggests, however, that there are genuine disputes as to material facts and that the defendant's motion for summary judgment must therefore be denied. One such dispute, urges plaintiff, is whether the corporation had knowledge of the various fraudulent transactions. The court, however, views this issue as a question of law, not of fact. The court concludes, as a matter of law, that the corporation did have knowledge of each and every transaction —and of its nature—at the time each transaction occurred. The remaining affirmative defenses, therefore, need not be considered, for knowledge on the part of the corporation entitles the defendant to summary judgment.

A

Section 10 of the Exclusions listed in the bonds issued by Aetna contains the following language:

"This bond shall terminate as to any Employee * * * *immediately upon discovery* by the Insured of any dishonest or fraudulent act on the part of such Employee * * *." (Emphasis added.)

The bond applications contained the following language:

"The present officers, attorneys, and employees * * * of the Insured have all to the best of the *Insured's knowledge and belief*, while in the service of the Insured, always performed their respective duties faithfully * * *." (Emphasis added.)

The bonds also required that notice of any dishonesty or fraud be given to Aetna as soon as practicable after discovery thereof. Thus, under the provisions of the bonds (and the applications, which were made a part thereof), as soon as the corporation became aware of the fraudulent transactions, the bonds terminated. Further, as concluded below, corporate knowledge, at the time the contract was entered into, of fraudulent transactions of those covered in the bond applications would have prevented the bonds from ever having become effective.

Plaintiff urges that a factual determination must be made as to the extent of public ownership of Phoenix's stock in order to resolve the knowledge question. The court does not agree. While corporate knowledge would be much more evident where three or four individuals completely owned and operated a corporation, substantial public ownership of stock need not foreclose imputation of knowledge to the corporation. That a corporation and its shareholders are two separate and distinct entities is too well established to require citation. Thus, it is irrelevant whether individual stockholders—or even a majority of them— were or were not made aware of the nature and extent of the transactions which resulted in losses to Phoenix. The bond ran to Phoenix, not its shareholders. The lack of knowledge of stockholders, *qua* stockholders, has no bearing on the issue of whether the corporation may be deemed to have had knowledge of the transactions in question.

Of course, since a corporation is able to act only through its agents, "knowledge of a corporation" must mean knowledge of its agents. In the model

corporate structure, stockholders, *qua* stockholders are not agents of the corporation; thus, their knowledge of specific transactions is irrelevant.

■ Ordinarily, the officers of a corporation and certain designated employees are those agents through whom the corporation acts. Thus, in determining whether the knowledge of those persons participating in the frauds must, as a matter of law, be imputed to Phoenix, the court must examine their relationship to Phoenix.

The conclusion cannot be avoided that those who actually controlled the corporation in its day-to-day activities had full knowledge of the nature of each of the questioned transactions, and that that knowledge must be imputed to the corporation.

Coven and Marshall, each of whom is alleged to have knowingly participated in many of the transactions, were two of the corporation's three directors on February 10, 1959. At that time, Coven was President and Marshall was Secretary and Treasurer of Phoenix.

On June 26, 1959, the charter of the corporation was amended to increase the powers of Phoenix's directors and to limit their liability. Of particular interest was the addition of Article Eighth to the Charter:

"1. The Board of Directors of the Corporation is hereby empowered to authorize the issuance from time to time of shares of its stock of any class, whether now or hereafter authorized * * * *for such considerations and on such terms as said Board of Directors may deem advisable,* subject to such limitations and restrictions, if any, as may be set forth in the by-laws of the Corporation. [No limitations and restrictions were set forth in the by-laws.] * * *.

"5. *In the event the Corporation enters into contracts or transacts business with one or more of its directors, or with any corporations or associations of which one or more of its directors are stockholders, the directors or officers, such contracts or transactions shall not be invalidated or in anywise affected by the fact that such director or directors have or may have interests therein, pecuniary or otherwise, which are or might be adverse to the interests of the Corporation,* even though the vote of such director or directors having such adverse interest shall have been necessary to obligate the Corporation upon such contract or transaction, and even though the fact of such interest was not disclosed to other directors or stockholders acting upon or in reference to such contract or transaction. *No director or directors having such adverse interest shall be liable to the Corporation or to any stockholder or creditor thereof or to any other person for any loss incurred by it or by reason of any such contract or transaction, nor shall any director or directors be liable for the profits realized thereon,* and such director or directors may be counted in determining the existence of a quorum of any meeting of the Board of Directors which may authorize such contract or transaction and may vote thereon." (Emphasis supplied.)

This article, along with the new article Sixth [2], specifically authorized transactions of the types later claimed to have been fraudulent.

---

**2.** Article Sixth contained the following provision:

"Without limiting the generality of the *foregoing powers and subject to and unless prohibited by the statutes of the State of Maryland, the Board of Directors,* without the consent or other action of the stockholders of the Corporation may authorize the Corporation to purchase, lease or otherwise acquire, deal in, hold, mortgage, convey or assign in trust, pledge, sell, convey, lease or otherwise dispose of, such property * * * as the Board of Directors may from time to time determine, and in payment for any property or for money or other consideration, as [and] so far as may be lawful, to issue or cause to be issued stock of the Corporation, or bonds, debentures, notes or other obligations thereof, secured or unsecured, and convertible into stock or not so convertible."

By September of 1959, the number of directors had been increased to 5. On September 15, 1959, the number was increased to 20; 5 of these 20 are claimed to have participated in fraudulent transactions.

From September of 1959 until November of 1960, the Executive Committee was composed entirely of those persons later accused of defrauding the corporation. By December 8, 1960, 4 of the 5 members of the Executive Committee were persons now alleged to have been involved in the fraudulent transactions. At all relevant times, at least 2 of those involved in the questioned transactions were officers of Phoenix.

That those who participated in the fraudulent transactions and who were officers and/or directors of the corporation had knowledge of their dishonest acts is not questioned. The only question is whether, under Maryland law, that knowledge can be imputed to the corporation on the basis of the facts set forth above and in plaintiff's pleadings and admissions.

In essence, plaintiff urges that the knowledge of Miller and the directors and officers involved in the frauds cannot be imputed to the corporation because their interests were adverse to the interests of the corporation. In Danzer & Co. v. Western Md. Ry. Co., 164 Md. 448, 165 A. 463 (1933), the court stated:

"The general rule * * * is that the knowledge of an officer of the corporation obtained while acting outside the scope of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation * * *." Id. at 457, 165 A. at 467.

This rule exists because the court ordinarily must presume that where an agent's interests in a transaction are adverse to those of his principal, he would not disclose material facts to his principal, since the disclosure would necessarily defeat the agent's personal interests. The general rule cannot apply where, as here, those who in actuality control the day-to-day operations of the corporation (and who, in actuality, are responsible only to themselves) have undertaken a series of transactions designed to defraud the corporation.

Knowledge of the dishonest transactions must be imputed to the corporation when so many of the officials and directors of the corporation are engaged actively in the frauds, since there was virtually no other responsible and active officer from whom the details of the transactions might have been concealed. Although Miller was not a director, his fraudulent activities were carried on with the knowledge and cooperation of some of the directors. Thus, full knowledge of all of the Miller transactions must also be imputed to Phoenix.

In addition to the number of persons involved in the questioned transactions, the number of the transactions and the length of time over which they occurred persuades the court to impute knowledge of the transactions to the corporation as a matter of law. In 3 Fletcher, Corporations § 826, at 146 (1965), the author remarks that

"an attempt has been made to differentiate a single fraudulent act of a corporate officer or agent from a series of fraudulent acts running over a long period of time * * *."

Such a distinction was made in Orme v. Baker, 74 Ohio St. 337, 78 N.E. 439 (1906), where defendants argued that knowledge of certain officers, who had been engaged in fraudulent activities, should not be imputed to the bank because the officers' interests had been adverse to the bank's. The court, at 442, treated this argument as follows:

"In other words, [the argument is that] they had been and were occupying a position with reference to the business of the bank, adverse to its interests, and while they were agents of the bank for some purposes, and in all things in the line of duty within the scope of their authority, yet they did not represent it in their fraudulent appropriation of its assets. * * *

"If the wrongs committed by the cashier and vice president had been confined to a single transaction, or to a few transactions within a brief period, there would be some room for the proposition made, that the bank should not be charged with their knowledge of its insolvent condition. But such was not the case. * * * [T]he fraudulent acts of the cashier and vice president consisted of many acts committed not at once, but during many months, perhaps years * * *. There was a protracted looting * * *.

Cf. Haynes v. Farmers' & Merchants' State Bank, 118 Neb. 297, 224 N.W. 316 (1929). In the present case, the persons engaged in the fraudulent transactions perpetrated the frauds over an extended period.

The present case must be distinguished from those cited by the plaintiff, in which only one director had actual knowledge of the fraudulent transactions, or where the directors were not also substantial stockholders. As stated by Chief Judge Thomsen, writing for the Fourth Circuit, a bond such as is here involved

"is intended to protect the corporation from the fraud or dishonesty of its employees, not to protect its creditors from the fraud or dishonesty of its stockholders and directors. * * *"

Kerr v. Aetna Casualty & Surety Co., 350 F.2d 146, 154–155 (4th Cir. 1965).

Although the knowledge of the individuals involved must be imputed to the corporation, there is no Maryland case explicitly considering whether, under the above circumstances, the corporation's concealment of that knowledge releases the surety. Perhaps the strongest case for Phoenix is McShane v. Howard Bank, 73 Md. 135, 20 A. 776, 10 L.R.A. 552 (1890). In that case, however, it is clear that, unlike the present case, there were no provisions in the bond requiring that notice be given.

The court concludes that the following language from West American Finance Co. v. Pacific Indemnity Co., 17 Cal.App. 2d 225, 61 P.2d 963 (1936), states the correct view of the consequences of a corporation's concealment of knowledge imputed to it:

"In this regard it may be said to be a fundamental principle of the law of fidelity guaranty that if dishonesty of an agent, whose fidelity is guaranteed under a bond, exists before or at the time the surety on the bond becomes bound thereby, and the principal conceals it from the surety at the time of obtaining the fidelity bond, the surety is not liable for the losses resulting therefrom; furthermore, that where there is a continuing guaranty for the fidelity of an agent and the principal discovers that the agent has been guilty of dishonesty in the course of his services and he continues him in the service without revealing such dishonesty to the guarantor on the fidelity bond, the principal cannot afterwards have recourse to the guarantor to make good any losses which may arise from the dishonest acts of such person during the subsequent service. * * * Furthermore, * * * the mere nondisclosure of the circumstances affecting the situation of the parties which are material for the surety to be acquainted with and are within the knowledge of the person obtaining the surety bond, is undue concealment even though not wilful or intentional or with a view to any advantage to himself. Manifestly, therefore, in the present case, the nondisclosure of the fraudulent practices which are being carried on by the majority of the board of directors under their corporate powers at the time of the application for the issuance of these successive fidelity bonds, and which resulted in the enormous losses the corporation now seeks to compel the surety to make good, constituted concealment from the surety of the material facts upon which it was clearly entitled to be informed before it could intelligently decide whether under the existing conditions it would assume the risk to be imposed upon it by the fidelity bonds. * * * And to the foregoing may be added that while this

group of men were thus proceeding to fasten these losses on the corporation's shoulders they were at the same time, as the governing board of directors of the corporation, obtaining from respondent fidelity bonds insuring their own honesty for the very purpose of placing the corporation, and incidentally themselves as the owners of the majority of the vote controlling stock therein, in a position to recoup from the surety the losses which they were bringing about by their own wrongful acts." 61 P.2d at 968.

### B

 The first bond application was signed by one George. Gratum, who was then president of Phoenix and who is not alleged to have participated in any of the fraudulent transactions. It may be argued from this fact that since Gratum may have had no knowledge of the fraudulent transactions, the bond became effective. The court concludes otherwise, however. In West American Finance Co. v. Pacific Indemnity Co., 17 Cal.App. 2d 225, 61 P.2d 963 (1936), appellant urged that the person who negotiated a bond on behalf of the corporation was himself ignorant of the transactions inquired about in the bond applications. The court finds the following language from that case appropriate here:

> "But obviously such ignorance on his part is entirely immaterial so far as concerns the question of the enforceability of the bonds for the simple reason that it was the corporation itself and not the employee who was making application for the bonds; the corporation itself and not the employee became the other party to the contract of guaranty and was named as the insured therein; and all of the benefits of the contract inured exclusively to the corporation." 61 P.2d at 969.

In conclusion, where individuals have organized a corporation to line their own pockets, and where they control substantially all of the activities of the corporation, their knowledge of the fraudulent nature of each and every questioned transaction must be imputed to the corporation. Since the first of these transactions took place before the bonds became effective, the failure to disclose the transactions to the surety operated to discharge the surety from any liability for the fraudulent transactions.

It is, therefore, this sixth day of July, 1966, by the United States District Court for the District of Maryland,

Ordered that defendant's motion for summary judgment be granted.