**PHOENIX SAVINGS AND LOAN, INC.,**
Appellant,

v.

**The AETNA CASUALTY AND SURETY COMPANY, Appellee.**

**No. 11011.**

United States Court of Appeals
Fourth Circuit.

Argued March 10, 1967.

Decided July 6, 1967.

Clarence W. Sharp, Baltimore, Md. (Herbert H. Rosenbaum, Baltimore, Md., on the brief), for appellant.

Elmer W. Beasley, Hartford, Conn. (William B. Kempton, Baltimore, Md., Alexander M. Heron and Preston C. King, Jr., Washington, D. C., on the brief) for appellee.

Before SOBELOFF and CRAVEN, Circuit Judges, and SIMONS, District Judge.

SIMONS, District Judge:

Appellant, Phoenix Savings and Loan Inc., successor to Phoenix Savings and Loan Association, Inc. (herein referred to interchangeably as "Phoenix") brought this action against defendant, The Aetna Casualty and Surety Company (herein referred to as "Aetna") in the Superior Court of Baltimore City, Maryland, seeking indemnity under a Savings and Loan Blanket Bond, Standard Form No. 22, revised to September 1960, for losses claimed to have been sustained by Phoenix through numerous dishonest and fraudulent acts of its officers, employees, agents and/or directors. The losses alleged to have been covered by the bond involve some fourteen detailed documented transactions occurring between December 1, 1959 and July 17, 1961 totaling in excess of $630,000.00.

Aetna removed the action to the United States District Court for the District of Maryland based upon diversity of citizenship and the jurisdictional amount involved. 28 U.S.C.A. § 1332.

Aetna answered, denying most of the allegations in the complaint and asserting a number of affirmative defenses which challenged Phoenix' right to recover under the bond upon the following

grounds: The persons alleged to have defrauded and caused Phoenix to suffer the alleged losses were not "employees" as defined by the bond; concealment by Phoenix of the alleged fraudulent acts when it applied for and obtained the bond; termination of the bond as to those persons who were employees upon discovery of the first fraudulent act on their part as provided in the bond; failure to give notice of the alleged losses within the time required by the bond;[1] and the bond does not cover the insured's own fraud.

Phoenix set forth its cause of action in a six-page Declaration to which was attached a lengthy Proof of Loss (Exhibit "C")including attached exhibits 1 through 18. In these instruments Phoenix enumerated the fraudulent and dishonest acts committed by certain of its officers, employees, agents and/or directors and certain corporations owned by them. The alleged primary wrongdoers were: Bernard Jay Coven who served at various times as Phoenix' president, director, member of the executive committee, and attorney; Saul Marshall who served from time to time as secretary, assistant secretary, treasurer, comptroller, auditor, member of the executive committee and director; and Albert Miller who was an agent, conveyancer, and mortgage representative, but who never served as an officer or director. Coven was paid for his services on a fee basis, Marshall received a salary of $150.00 per month, and Miller received commissions on the transactions he handled.

The following represents the four main areas of alleged loss to Phoenix: (1) Albert Miller frauds from his pocketing $50,000.00 in connection with his purchase of second mortgages for Phoenix, and the loss of in excess of $100,000.00 from the unauthorized and fraudulent issue of Phoenix common stock to him; (2) $102,000.00 loss from fraudulent and illegal misuse of securities pledged by North Shore Realty Corporation and the wrongful conversion of collateral securities pledged by it to Phoenix for a loan of $172,500.00, which were used for the personal benefit of Coven and Miller; (3) Loss in excess of $600,000.00 from fraudulent and dishonest diversions of the proceeds of sale of 367,000 shares of Phoenix common stock to the public; (4) Loss in excess of $62,000.00 from the fraudulent and dishonest purchase and resale of mortgages to Phoenix by Great Eastern Mortgage Corporation and Commercial Finance and Acceptance Corporation (both organized and dominated by Coven and Marshall), which resulted in the diversion of profits from Phoenix to those two closely held corporations, and in "kickbacks" or "finders fees" to Miller.

Phoenix' original association, Phoenix Savings and Loan Association, Inc., was incorporated under the laws of Maryland on December 29, 1958 and conducted actively its business in the City of Baltimore, Anne Arundel County and Baltimore County until July 17, 1961 at which time it was placed in the hands of a conservator by the Circuit Court of Baltimore City.

Under the Association's Charter as amended the corporation was managed and controlled by a Board of Directors of not less than three nor no more than thirty. The Charter also provided for the issuance of Class A common stock, with approximately 367,000 shares being issued; Class B common stock with approximately 36,000 shares being issued; and Class C common stock of which approximately 400 shares were issued. The holders of the Class A and B stock had one vote for each of the shares held, and the Class C stockholders each had one vote. The Articles of Incorporation further provided that "the common stock Class A and common stock Class B shall be identical in all respects, except that

---

1. Appellant concedes that no notice or claim of loss was given by Phoenix to Aetna until after the conservator took over on July 17, 1961.

no act of the Corporation requiring the consent of the stockholders shall be valid unless concurred in by not less than 75% of the holders of Class B common stock."

Phoenix' records [2] indicate that 17,000 shares of Class A common stock and 6,000 shares of Class B common stock were issued to Bernard Jay Coven; that 6,519 shares of Class A common stock and 1,850 Class B common stock were issued to Saul Marshall; and that 55,000 shares of Class A common stock were issued to Albert Miller or corporations owned and controlled by him. Phoenix' records further show that Coven, Marshall and Miller were employees of the corporation who performed various administrative acts in the day to day operations of the corporation.[3] There is some dispute between Phoenix and Aetna as to the dates within which the alleged fraudulent transactions occurred, Phoenix contending that the bulk of the losses occurred from November 1960 to July 17, 1961 (the date when the conservator was appointed), and Aetna contending that the major portions of such transactions occurred before the end of December 1960. Nevertheless, there is no factual dispute that Aetna's Discovery Fidelity Bond No. 73 F 163 effective one year from December 1960 with a limit of liability of $100,000.00 for each loss covered effectively any of the alleged losses within the liability limit of the policy unless such losses are excluded or are not covered because of some other provision of the bond itself.

After issues were joined Aetna served numerous requests for admissions as to certain factual statements, and the genuineness of numerous documents were either admitted or denied by Phoenix.

Thereafter, pursuant to motion for summary judgment by Aetna and after lengthy arguments by counsel for the parties the court below on July 6, 1966 granted summary judgment in Aetna's favor concluding that "where individuals have organized a corporation to line their

---

2. Paragraph 3 of Affidavit of J. Carlton Swain, President of Phoenix, in Opposition to Motion for Summary Judgment filed February 21, 1966, contains the following statement:

\* \* \* \* \* \* \* \* \* \* \* \* \*

"3. The books and records of Phoenix Savings and Loan, Inc. show that stock was issued to the following persons in the following amounts:

| "Bernard J. Coven | 17,000 shares Common Class A |
| | 6,000 shares Common Class B |
| Saul Marshall | 6,519 shares Common Class A |
| | 1,850 shares Common Class B |
| Albert Miller or corporations he owned and controlled | 55,000 shares Common Class A |

"The above mentioned shares of common stock of the corporation were issued and outstanding during the conservatorship and that the owners of this stock had the right to redeem is pursuant to the plan of reorganization by the payment of One Dollar ($1.00) per share and that none of the parties mentioned above redeemed the said stock."

---

3. Paragraph 9 of Affidavit of J. Carlton Swain, President of Phoenix, in Opposition to Motion for Summary Judgment filed February 21, 1966, contains the following statement:

\* \* \* \* \*

"9. The records of Phoenix Savings and Loan, Inc. show that Bernard Jay Coven, Albert Miller, and Saul Marshall were employees of the corporation who performed various administrative acts in the day to day operations of the corporation and that Marshall was paid a salary of One Hundred Fifty Dollars ($150.00) per week, Miller was paid commissions and Coven was paid approximately Six Thousand Dollars ($6,000.00) in legal fees. In addition, the records of the corporation disclose that Marshall and Coven were paid for services by the issuance of corporate stock."

own pockets, and where they control substantially all of the activities of the corporation, their knowledge of the fraudulent nature of each and every questioned transaction must be imputed to the corporation. Since the first of these transactions took place before the bonds became effective, the failure to disclose the transactions to the surety operated to discharge the surety from any liability for the fraudulent transactions."

■ The issue before us is whether the court below concluded correctly that there are no genuine issues of fact, or conflicting inferences deductible therefrom upon the present state of the record. If there is no dispute that all of the fraudulent and dishonest acts of Coven, Marshall, Miller, and the others acting in concert with them were in fact the acts of the corporation, and further that their guilt knowledge of all of such acts were imputed to the corporation as a matter of law at the time they were committed, then under the provisions of the bond (which must be construed according to Maryland law and which must not be extended beyond the terms of the contract itself when considered in accordance with the plain ordinary and usual meaning of the terms the parties have used in arriving at the intent of the contracting parties) there is no valid coverage for such wrongful acts. Furthermore, the bond insured the corporation itself and not its creditors, customers, depositors or stockholders; and the successor Association has no better rights than did the original Association. Kerr, Trustee v. Aetna Cas. & Sur. Co., 350 F.2d 146 (4th Cir. 1965).

■ It is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. Neither should summary judgment be granted if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions. 3 Barron & Holt-zoff, Federal Practice & Procedure § 1234 (Rules ed. 1958). Burden is upon party moving for summary judgment to demonstrate clearly that there is no genuine issue of fact, and any doubt as to the existence of such an issue is resolved against him. 3 Barron & Holtzoff, Federal Practice & Procedure § 1235 (Rules ed. 1958).

■■ In Kirkpatrick v. Consolidated Underwriters, 227 F.2d 228 (4th Cir. 1955), this court repeated its holding in Pierce v. Ford Motor Co., 190 F.2d 910 (4th Cir. 1951), that summary judgment under Rule 56 should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. This is true even where there is no dispute as to the evidentiary facts but only as to the conclusions or inferences to be drawn therefrom, and the "party opposing a motion for summary judgment is entitled to all favorable inferences which can be drawn from the evidence." Cram v. Sun Ins. Office, Ltd., 375 F.2d 670, 674 (4th Cir. 1967).

As we stated in American Fid. & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (4th Cir. 1965):

"Not merely must the historic facts be free of controversy but also there must be no controversy as to the inferences to be drawn from them. It is often the case that although the basic facts are not in dispute, the parties nevertheless disagree as to the inferences which may properly be drawn. Under such circumstances the case is not one to be decided on a motion for summary judgment."

A careful review of the record which was before the court below convinces that Aetna has failed to carry its burden to establish clearly and without controversy its affirmative defenses sufficiently to be entitled to summary judgment. The alleged principal guilty conspirators who admittedly were primarily responsible for the dishonest and fraudulent acts resulting in Phoenix' losses allegedly covered by the bond were Coven,

Marshall and Miller. While Coven and Marshall were officers and directors during all pertinent periods Miller was never an officer, director or member of the executive committee, and reasonably should be classified as an "employee" as defined in the bond.[4] The record further reveals substantial ground for doubt as to whether Coven and Marshall may also have been "employees" within the terms of the bond. Thus, the question of whether these three malefactors were employees or whether they had "substantial control" of Phoenix at all crucial times when the alleged frauds were perpetrated is a question of fact in dispute between the parties. From our view a substantial doubt exists as to the actual amount of the various classes of common stock owned by them at the various times when they were actively defrauding the association. Surely the record does not convince beyond reasonable doubt that the three of them, including any corporations which they controlled, either owned or controlled a majority of any of the three classes of voting stock at any one period.

■ Also, during the periods of the alleged losses Phoenix was governed by a minimum of five and a maximum of twenty-six directors. Miller was never a director, Coven and Marshall at no pertinent time constituted a majority of the board of directors, and neither is there a valid basis for concluding that the other members of Phoenix' Board of Directors were either controlled by these three bad men or had knowledge of their dishonest and fraudulent acts. Thus it is not "perfectly clear that no issue of fact is involved". Pierce v. Ford Motor Co., 190 F.2d 910, 915 (4th Cir. 1951).

Although some of the losses claimed by Phoenix allegedly resulted from a conspiracy among Coven, Marshall and Miller or between two of them, neverthe-

less, it contends that other of its losses resulted through acts of Miller alone, without any knowledge or participation by Coven, Marshall or any other officers or directors of Phoenix. The record does not clearly disprove such assertion. Ordinarily knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation. West American Fin. Co. v. Pacific Indem. Co., 17 Cal.App.2d 225, 61 P.2d 963 (App.Div.1936). However, such is not necessarily true if the officers and directors do not have the requisite control. In William Danzer & Co. v. Western Maryland Ry., 164 Md. 448, 165 A. 463, 467 (1933), the court stated:

"The general rule * * * is that the knowledge of an officer of the corporation obtained while acting outside the scope of his official duties, in relation to a matter in which he acted for himself and not for the corporation, is not, merely because of his office, to be imputed to the corporation.'

See also McShane v. Howard Bank, 73 Md. 135, 20 A. 776, 10 L.R.A. 552 (1890).

Phoenix concedes that Coven, Marshall and Miller exercised substantial day to day control over some of its operations, but it stoutly contests that they owned directly or indirectly a majority of the voting stock, that they constituted or controlled a majority of the board of directors, or that they had substantial control of all of the corporate affairs when all of the alleged fraudulent acts were consummated. Many of the twenty-six directors of Phoenix during the critical period were outstanding and honorable citizens whose honesty and integrity are not questioned and who are not linked with any of the alleged frauds. Under its charter Phoenix' stockholders elected its directors, and the directors controlled the corporation. Thus the ultimate cor-

---

4. "Section 1. The following terms, as used in this bond, shall have the respective meanings stated in this Section:

"(a) 'Employee' means:

"(1) any officer or employee of the Insured;

(2) any employee of an executive officer of the Insured;

(3) any duly elected or appointed attorney of the Insured or any employee of such attorney; * * * *"

porate authority was in the stockholders. The facts as presently developed upon the record fail to bring it within the ambit of Gambrell, Receiver, v. Aetna Cas. & Surety Co., 350 F.2d 146 (4th Cir. 1965), and Western American Fin. Co. v. Pacific Ind. Co., supra, relied upon by appellee and the court below. In *Gambrell*, at page 154, the definition of "employee" [5] contained in the bond was different to that in the bond before us, Note 3, supra. In *Gambrell* this court, in reversing the district court which had found that Cudd and Coan (the two wrongdoers) were "employees" of Underwriters in bringing about the claimed loss, concluded that the two were its sole directors, chief executive officers and owned individually seventy-five percent of its stock with the remainder being held by a private corporation which they owned. The testimony developed at the trial in the court below demonstrated clearly that Cudd and Coan had full and absolute control of Underwriters and all of its activities. We accordingly held that they were not "employees" within the meaning of the bond even though they were paid salaries by the corporation, and that the bond was not intended to cover the fraud and dishonesty of men who are "the sole stockholders, as well as the only directors of a closely held corporation." We found it unnecessary to pass upon the other defenses of Aetna which were substantially the same as those asserted in this action and intimated no opinion thereabout.

In *West American Finance,* supra, four men, Harper, Hadley, Scully and Sinclair, owned all of the stock in First Mortgage Bond Company which in turn owned a majority of stock in California Securities Company, which also in turn owned a majority of the voting stock in Empire Finance, which in turn owned a majority of the voting stock in West American. The same four men were the sole directors and officers of the parent com-

pany, First Mortgage Bond Company. Through their controlling positions with all four companies they allegedly consummated certain transactions which defrauded West American Finance. In sustaining the surety company's demurrer the court recognized that the four wrongdoers had actual control of the corporations and held that "the knowledge of the majority members of said board of directors of their own fraudulent transactions was imputed to the corporation itself * * *", and that "the insuring clauses of the bonds were unenforceable against the surety because of the non-disclosure to the surety of the fraudulent practices, which at the time the successive bonds were applied for and issued, were being carried on under the name of the corporation and in the exercise of its corporate powers." The controlling factor in the court's decision in *West American Finance* is found 61 P.2d at page 968 where it stated that:

> "[W]hile this group of men were thus proceeding to fasten these losses on the corporation's shoulders they were at the same time, as the governing board of directors of the corporation, obtaining from respondent fidelity bonds insuring their own honesty for the very purpose of placing the corporation, and incidentally themselves as the owners of the majority of the vote controlling stock therein, in a position to recoup from the surety the losses which they were bringing about by their own wrongful acts."

The factual situations in the two foregoing cases where actual corporate control of the wrongdoers was clearly present are different from the case before us in that the record here does not demonstrate clearly such corporate control by the malefactors. In reversing we do not intimate any opinion as to the merits of the case. We are merely saying that we do not agree with the court below that summary judgment is a

---

5. " 'Employees' covered by the bond were defined (see I above) as 'officers, clerks and other natural persons in the service of the insured * * * who are compensated by salary, wages or commis-

sions, and whom the Insured has the right to govern and direct at all times in the performance of such service * * *'."

proper method to dispose of the complex issues of this controversy, inasmuch as there are disputes or controversies as to the historic facts and the inference to be drawn therefrom. There is an unresolved issue as to whether some of the frauds of Miller, an "employee" within the scope of the bond, were known to or participated in by the executive officers and/or directors of Phoenix. Further, there is a question as to whether the dishonest activities of Coven and Marshall were committed as "officers and employees" under the coverage of the bond, or as "directors" so as to exclude their acts from coverage of the bond.[6] Further, there is sharp dispute between Phoenix and Aetna, which to our mind is unresolved, as to whether Coven, Marshall, Miller, and possibly one or two others who are alleged to be in *pari delicti* in some of the frauds, had such control of Phoenix during all of the times such frauds were in process that their guilty knowledge was imputed to Phoenix as a matter of law. Upon a trial of the case the court below after hearing Phoenix' evidence will be in a much better position to determine whether the trial should proceed further, or whether a verdict should be directed in favor of Aetna.

Another matter of grave concern to us is what stock or interest, if any, the wrongdoers acquired in appellant as successor to Phoenix Savings and Loan Association, Inc., after the latter was placed in the hands of a conservator on July 17, 1961. The Association remained under his control until October 29, 1962 when it was turned over to appellant under a plan of reorganization directed and approved by the Circuit Court of Baltimore City.[7] Should Phoenix prevail ultimately against Aetna recovery will inure to the benefit of its stockholders. Inasmuch as the records before the court do not list the names or numbers of shares owned by Phoenix' present stockholders, it cannot now be determined what benefits, if any, would accrue to the credit of the wrongdoers who should not be allowed under any circumstances to profit from their own reprehensible and criminal conduct.

For the foregoing reasons the order of the court below granting Aetna's motion for summary judgment is reversed.

Reversed.

---

6. "EXCLUSIONS

"Section 2. This Bond Does Not Cover:

"(c) Any loss resulting wholly or partly from the wrongful act or default of any of the directors or trustees of the Insured who are not employed by the Insured at a salary, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors or trustees of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured."

7. The reorganization plan infused new capital in the successor association as follows: $100,000.00 from Security Finance Insurance Corporation; $144,000.00 from a new public stock issuance to old stockholders; and $256,000.00 from the new group of underwriters who formed the successor corporation.