250 Md. 549 (1968)
243 A.2d 858
REPUBLIC REALTY COMPANY, ET AL.
v.
PHOENIX SAVINGS AND LOAN ASSOCIATION, INC.
[No. 302, September Term, 1967.]
Court of Appeals of Maryland.
Decided July 9, 1968.
The cause was argued before HAMMOND, C.J., and MARBURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.
*550 Charles C.W. Atwater, with whom were David A. Carney and Mylander & Atwater on the brief, for appellants.
Clarence W. Sharp, with whom was Herbert H. Rosenbaum on the brief, for appellee.
McWILLIAMS, J., delivered the opinion of the Court.
The new Phoenix has risen from the ashes[1] of the old Phoenix but among the ashes there still remain a few glowing embers. This appeal is one of them.
Brevity and clarity will better be achieved if first we identify the persons involved:

 Beiles Harry Beiles (Feiles), a vice president of Phoenix, a
 director, and an "authorized officer" on checks and
 passbooks.
 Garbis Unless otherwise indicated, synonymous with Morris
 Garbis, Preston Realty Company, Bris, Realty Company,
 Dood, Inc., Home and Investment Corp., and Roxy Realty
 Company.
 Irismark Irismark, Inc., a corporation owned by the Lapidus
 family. Lapidus was president and in control of its
 operations.
 KWT KDN KWT KDN, Inc., a corporation alleged to be owned and
 controlled by Miller.
 Lapidus Unless otherwise indicated, synonymous with Stanley
 Lapidus, Irismark, Inc., Republic Realty Company and
 the Lapidus family.
*551 Marshall Saul Marshall, the secretary, treasurer, comptroller and
 auditor of Phoenix. Also a director and a member of the
 executive committee. Below his signature on checks and
 passbooks appear the words "authorized signature."
 Miller Albert Miller, mortgage representative of Phoenix and, in
 this transaction, an authorized agent of Phoenix.
 New Phoenix The reorganized company, Phoenix Savings and Loan, Inc.
 North Shore North Shore Realty Corporation.
 Phoenix Phoenix Savings and Loan Association, Inc., organized
 Dec. 1958, Conservator appointed 18 July 1961,
 reorganized 12 May 1962.
 Quarngesser Elwood S. Quarngesser, president and principal owner of
 North Shore.
 Republic Republic Realty Company, an entity, apparently
 unincorporated, of the Lapidus family, controlled by
 Lapidus.

The appellee (Phoenix) has challenged the validity of 4 savings accounts standing in the names of Irismark ($16,937.62), Lapidus in trust for Irismark ($8,000), Lapidus ($10,000) and Republic ($7,087.48). The $8,000 account and the $10,000 account were originally a part of the Irismark account. The transfers seem to have been made to bring the Irismark account below the maximum insurance level. The trial judge, without giving any reasons for his action, sustained the decision of the special master denying payment of the accounts. He declared that, in his opinion, there was sufficient evidence to justify the conclusions reached by the special master. We disagree.
A proper understanding of the questions presented for our consideration requires the narration, in some detail, of the significant events and circumstances leading up to this litigation. *552 In April 1960 Garbis owed Lapidus $134,570.50 secured by 15 first mortgages. Delinquent in his payments and to stave off the threat of foreclosure Garbis offered to Lapidus additional security. To this end Garbis transferred to Irismark, which was organized by Lapidus for the purpose, a ground rent, some hypothecations, a few leaseholds and a number of second mortgages. The writing set forth below represents the agreement or understanding between Garbis and Lapidus.
 "April 15, 1960
 "TO WHOM IT MAY CONCERN:
 RE: IRISMARK, INC.
"I, Stanley I. Lapidus, President of IRISMARK, INC. hereby agree to grant an option to Morris Garbis or any designated party of his choice to redeem the corporation as a whole by means of transfer of said corporation. This will be done in the following manner:
"Upon repayment in full of all notes and mortgages to Stanley I. Lapidus and the Woodmoor Savings & Loan Association; this money was used for the purpose of bringing mortgage accounts up to date and other pertinent operating costs needed to put corporation in a staple [sic], financial status. IRISMARK, INC. will also be responsible for any deficiency judgments against Morris Garbis, Ruth Garbis, The Preston Realty Co., The Roxy Realty Co., Bris Realty, Inc., Home & Investment Corp. & Dood, Inc. to Stanley I. Lapidus and Samuel Lapidus and the First Republic Building and Loan Association (formerly known as Republic National Building & Loan Association).
"Any money loaned from Stanley I. Lapidus and Woodmoor Savings & Loan Association to IRISMARK, INC. will bear interest at the rate of 10% per year.
"For management expenses, a salary of $25.00 per week will be paid to Stanley I. Lapidus.

*553 "This option becomes null and void two years from date hereof, April 15, 1960.
 ___________________
 Stanley I. Lapidus"
Garbis worked out a deal with Miller, with whom he had done business on at least one earlier occasion, for the sale to Phoenix of most of the second mortgages held by Irismark, 46 to be in the first package, 9 in the second. The purchase price, it seems, was to be 50% of the face amount of the mortgages, and the face amount also happened to be the total of the unpaid balances due thereon. Garbis then persuaded Lapidus to convey the second mortgages to Phoenix upon payment to Irismark of $34,947.62 out of the first package and $7,087.48 out of the second package. Lapidus said Garbis was about $59,000 in arrears in his payments and he agreed because he wanted to "decrease" his loss. Lapidus understood that Garbis was to get $20,000 out of the deal upon settlement of the first package, but the testimony is not clear as to when he first became aware of it. Lapidus testified, and the contrary does not appear, that he was entirely unaware of the terms of whatever the agreement was between Miller and Garbis.
On 23 November 1960, Lapidus went to the office of Phoenix for settlement of the first package (46 mortgages). There he learned for the first time which mortgages were to be transferred and that the amount to be paid to Irismark plus the $20,000 to Garbis equaled 50% of the face amount of the 46 mortgages ($109,875.25).
Miller, who conducted the settlement, handed to Lapidus the following checks and asked Lapidus to endorse them:

 #7666  Payable to Irismark ....................... $ 20,000.00
 #7667  Payable to Irismark ....................... 34,937.62
 #7668  Payable to Irismark ....................... 10,987.52
 #7669  Payable to Irismark ....................... 43,950.11
 ___________
 $109,875.25

All of the checks were specially printed for the use of Phoenix and all were drawn upon The Equitable Trust Company. The *554 notation "In payment of purchased schedule of mortgages" appeared on all of the checks and all were signed by Marshall, beneath whose signature were the words "authorized signature." Lapidus endorsed each check "Irismark, Inc., Stanley Lapidus, Pres." and handed them back to Miller. Each of the four checks was endorsed by Phoenix, beneath the Irismark endorsement, "For Deposit Only" and all were thereafter deposited to the account of Phoenix in The Equitable Trust Co. At this point, it is clear, no money had changed hands. Nothing but bookkeeping had taken place. As stated by the special master:
"Lapidus testified that he was told by Miller at settlement that the cheques in excess of the 50% purchase price represented the difference between the face of the mortgages and the purchase price, that this was merely bookkeeping for Phoenix and was placed in its reserve. He testified he understood it to be a bad debt reserve, and was so told by Miller. On cross-examination, he testified that he believed Miller, that it did not seem strange to him, that he had a similar thing with his own accountant where the item was held as a `deferred profit.'"
Although Lapidus had expected to receive cash at the settlement he was induced to accept a Phoenix savings account book showing a deposit of $34,947.62, 25% of which was withdrawable at the end of one year and an additional 25% at the end of each succeeding year. He felt this was the equivalent of cash, which he did not then need, so he agreed. The passbook, dated 23 November 1960, was signed by Miller above the imprinted signature of Feiles, the "authorized officer."
Lapidus left with his passbook and, unknown to him, it seems, an unrestricted passbook was issued by Miller to "Morris Garbis, Trustee" for $20,000 and a passbook, also unrestricted, to KWT KDN, for $43,950.11. $10,987.52 was credited to the Commissions and Fees Account on the books of Phoenix.
On 8 December 1960 settlement for the second package of 9 mortgages was held. Three checks ($7,087.48, $5,670.00 and $1,417.49) were issued, all payable to Irismark, all endorsed by Irismark and handed back to Miller. The checks, signed by *555 Marshall, were drawn on The Equitable Trust Company and deposited to the account of Phoenix in the same bank. Lapidus received a similar passbook, this time in the name of Republic, showing a deposit of $7,087.48. Again unknown to him, $5,670.00 was credited to the KWT KDN savings account and $1,417.49 was credited to Commissions and Fees on the books of Phoenix. Garbis had nothing coming to him out of this settlement.
The net result of the two transactions was that Phoenix had acquired the 55 second mortgages without putting up a penny of cash. Indeed, it does not appear anywhere in this record that Phoenix, at the time, had that much cash. Lapidus had withdrawn nothing but a few dividends from his accounts before they were frozen in October 1961. The present balance as shown in the Lapidus accounts is $42,025.10. Garbis managed to extract about $13,000 from his account before his balance, $6,815.43, was impounded. The history of the KWT KDN account is worth noting. As has been said, the account was opened on 23 November 1960 with a credit of $43,950.11. On 8 December 1960 the $5,670 credit was entered. During the next 7 months there appear 17 additional credits, including 3 dividends, totaling $30,022.76. Thirteen withdrawals, totaling $53,370.06 are shown. On 30 June 1961 the indicated balance was $26,272.81 which, on the same day, was transferred to the account of North Shore. The KWT KDN account was then stamped "CLOSED." Except for the 2 credits above mentioned and the final withdrawal none of the credits or withdrawals has been identified as to source, purpose or use. We shall have more to say about this.
There is no need to set forth all of the findings of fact of the special master. We shall comment briefly, however, on a few of his findings.
"21. As a result of the above transactions, Phoenix paid $111,645.21 for 55 second mortgages with a then unpaid principal balance of $124,050.22, or 90% of such balance. Of the $111,645.21, the sum of $42,025.10 went to Lapidus, $20,000 to Garbis, and $49,620.11 went to KWT KDN (or Miller)."
*556 We think finding No. 21 is inaccurate. Phoenix certainly did not "pay" $111,645.21 for the mortgages. No money changed hands. "The sum of $42,025.10" did not go to Lapidus. Phoenix has not yet parted with that money. Nor did "$20,000" go to Garbis. Phoenix still has $6,815.45 of that "$20,000." The record is not at all clear in respect of what Miller actually did get, if anything. And, as we shall see, there is substantial evidence that Phoenix got back at least $26,272.81 of the KWT KDN account.
"No. 22. The payments of $49,620.11 by Phoenix to Miller were not authorized by Phoenix."
We find no evidence to support the fact that the opening of the KWT KDN account and the issuance and delivery of the passbook to Miller were not authorized by Phoenix. We shall have more to say about this.
"26. Both Lapidus and Garbis had interests in the mortgages assigned to Phoenix."
The record, it seems to us, makes it quite clear that Irismark was vested with exclusive title to the mortgages and that Garbis' only "interest" therein was the right, under certain conditions, to acquire or redeem, not the mortgages, but the corporation, Irismark, Inc.
After discussing what he considered to be the applicable principles of law, the special master stated his conclusions. He said:
"Regardless of the value of the 55 second mortgages assigned to Phoenix, Phoenix was defrauded in that it paid $111,645.21 when it could have acquired them for $62,025.11. The excess payment of $49,620.11 went to Miller and Phoenix received no consideration therefor. Phoenix was defrauded to the extent of $49,620.11. Lapidus, by endorsing the cheques made that fraud possible.
"Under the authority quoted above, it is not necessary that Lapidus be found to have participated in the fraud, consciously and knowingly. It is sufficient if, *557 when he knew or should have known that a fraud was being perpetrated, he nevertheless acted in a way which made the fraud possible.
"Here, Lapidus had incentives not to check into Miller's activities. Lapidus was owed approximately $135,000 by Garbis. Lapidus expected to suffer a $59,000 loss. To prevent or reduce that loss, he took, in April, 1960, through Irismark, a large number of second mortgages. He apparently was not interested in their value as he testified he never inspected the properties, never had the titles searched, and knew they were all subject to first mortgages. Further, Irismark, the titular holder of these second mortgages, was operated at a loss and required Lapidus to put more money into it. This unfavorable situation continued for 6 months, until November, 1960.
"Consequently, when, through Garbis, he received an offer to dispose of a number of these mortgages, first for $34,000 and later a second group for $7,000, he agreed to the proposition without even checking on which mortgages were being sold or what was their value. His sole aim was to reduce his expected loss of $59,000. He was even willing to accept in lieu of cash, deposits in Phoenix which could only be withdrawn 25% per year beginning in the second year.
"Although he understood the purchase price was 50% of the principal balance of the mortgages, on the first settlement he endorsed in blank, cheques in double that amount, took his $34,000 passbook `and walked out.' He was not interested in what, if anything, Garbis got out of the settlement. He testified he may have suspected that Garbis got something, though he also testified he did not regard Garbis the owner of any part of the mortgages being transferred.
"Apparently, if Lapidus had checked on the first transaction, or if he did check, he would have seen that the cheque of which he received the benefit, and the cheque of which Garbis received the benefit, together *558 made up the aggregate purchase price of the 50% of the mortgages. That should have put him on notice that when he endorsed the other two cheques he was acting as an instrument which made possible the defrauding of Phoenix. As a person experienced in real estate, he must have known that by the issuance of the four cheques, Phoenix was paying double the agreed price, and he must have realized that the issuance of the extra cheques was not the way to set up a bad debt reserve for the difference between the purchase price and the face of the mortgages purchased. The second transaction is governed by the same principles."

I.
Lapidus argues earnestly and cogently that Phoenix has not met the burden of proving it was defrauded of $49,620.11, an amount characterized by the special master as "the excess payment * * * [which] went to Miller [KWT KDN]." As Lapidus points out, absent a fiduciary relationship, fraud is never presumed, it must be proved. Bathan v. U.S., 173 F.2d 953 (4th Cir.1949), and the cases cited therein. While we shall not undertake to decide whether a fraud actually was perpetrated in respect of Phoenix, we shall indulge in some comments on the evidence, or lack of it, which might be said to support Lapidus' contention.
There is evidence in the record that there was some kind of an agreement between Miller and Phoenix, at least some of the provisions of which appear to be that Miller was to receive a finder's fee on each mortgage procured for Phoenix, that he had control of the mortgage operations of Phoenix from March 1960 to June 1961, that he was to receive a percentage of every mortgage deal purchased by Phoenix, and that he was to receive a commission of 40% for obtaining mortgages.
The KWT KDN account may indeed have been tainted with fraud but our attention has not been directed to any evidence of it, nor have we found any. The 19 credits and 13 withdrawals could have been made in connection with lawful operations *559 by Phoenix and Miller. There is no evidence to the contrary. Moreover, there is the evidence that Miller may have been entitled to a 40% commission, which would explain the 2 credits to the KWT KDN account. Peat, Marwick and Mitchell, the Conservator's accountants, "were not able to establish the nature of the transaction giving rise to the credit of 40% of the face amount of the mortgages to the account of KWT KDN." Why Miller should have been given 40% of the face value rather than 40% of the purchase price, or why he should have been entitled to as much as 40% is, of course, another quarrel.
The validity of the KWT KDN account was under direct attack in the North Shore proceeding.[2] There Judge Oppenheimer (later a member of this Court) observed:

*560 "It is contended by the conservator that the Miller accounts [including KWT KDN] were invalid and *561 spurious. They may or may not have been so. That question may come up for adjudication between different parties at some time in the future; but the burden here is on the party claiming fraud.
"I do not find that there is sufficient affirmative evidence to show that the Miller accounts were invalid."
*562 In respect of the application of the $26,272.81 balance in the KWT KDN account to North Shore, Judge Oppenheimer said:
"It is undisputed that * * * [the Fruehauf stock], which had been pledged in connection with the loan from Phoenix to North Shore Realty Corporation, had been illegally pledged by Phoenix * * * [to secure a bank loan]. * * * North Shore Realty Corporation had a valid cause of action against Phoenix * * * for the misuse of property as collateral. North Shore and Phoenix had the right to enter into a fair compromise of this claim."
* * *
"In short, as far as North Shore Realty Corporation is concerned, I find that the transaction complained of has not been proved to be fraudulent. The fact that a preference may have been involved does not make it illegal.
"The Master's report, in my judgment, rests upon a sound analysis of the facts and of the law."
The special master in the North Shore case was of the opinion that
"* * * if it were assumed that the transferring of the Miller controlled deposits [KWT KDN] to a credit on the North Shore loan were treated as an unlawful or fraudulent preference to Miller, in my opinion this was a scheme only to the benefit of Phoenix, and not for the benefit of North Shore or Quarngesser." (Emphasis supplied.)
It seems odd that Miller would have agreed to the transfer of the $26,272.81 balance in the KWT KDN account if, in fact, that balance was the equivalent of cash and if, in fact, he was the absolute owner of it. At very least it bespeaks an intimacy, understanding and rapport between himself and Phoenix which not only is unexplained but which, in the context of this record, is inconsistent with the predatory role in which he has been cast by the appellee and the special master. It may later be *563 established that Miller is indeed a thoroughgoing villain but there does not seem to be probative evidence of it here.
In the memorandum of the Conservator in the North Shore proceeding there is a statement that the KWT KDN account "was also pledged as collateral for a [$31,000] loan to Miller [or one of his companies] for the purchase of [26,000 shares of] Phoenix stock." If we assume that the stock was actually purchased it would seem to follow that no real money ever left the coffers of Phoenix.
Another curious thing about the KWT KDN account is that on 2 February 1961, more than 2 months after the Irismark transaction, the ledger card shows a balance of over $40,000. On 10 April, 4 months later, a balance of over $39,000 was indicated. As a matter of fact, between 23 November 1960 and 30 June 1961, when the account was closed, the indicated balance was never less than $23,825. For a company claiming to have been cheated out of $49,620.11 it would certainly seem that it had no end of opportunities to recoup a substantial slice of its loss by the simple expedient of exercising its common law bankers' lien.
Since our decision will rest upon a different basis we find it unnecessary to decide whether Phoenix has met the burden of proving the fraud.

II.
Phoenix does not charge Lapidus with having been a party to a direct or conscious fraud. It points instead to the conclusion of the special master that "if Lapidus had checked on the first transaction * * * he would have seen that the cheques of which he received the benefit, and the cheque of which Garbis received the benefit, together made up the aggregate purchase price of 50% of the mortgages" and that this "should have put him on notice that when he endorsed the other two cheques he was acting as an instrument which made possible the defrauding of Phoenix." Emphasized also is the conclusion that Lapidus "must have realized that the issuance of the extra cheques was not the way to set up a bad debt reserve for the difference between the purchase price and the face of the mortgages purchased." Phoenix then argues that the findings of the special *564 master are prima facie correct and that they will not be set aside unless they are clearly erroneous or unless he has misapplied the law to his findings of fact, citing Bris Realty Co. v. Phoenix, 238 Md. 84, 208 A.2d 68 (1965), and Rule 573 (a) of the Rules of the Supreme Bench of Baltimore City.
In discussing why we think the special master's findings are clearly erroneous we shall assume that Phoenix actually was defrauded by Miller in the transaction. The question then is whether Lapidus knew, or should have known, that the perpetration of a fraud was being contemplated and that without some action or acquiescence on his part the fraud could not be accomplished.
There is nothing in the record suggesting that the mortgages were invalid, that less than the face amount was due thereon or that the title to any of them was defective. There is no proof that the purchase price was excessive or unconscionable. It is not suggested there was any impropriety, on the part of Lapidus, in agreeing to share $20,000 of the purchase price with Garbis. He had agreed to release the mortgages to Phoenix on payment to him of a stipulated amount of cash, about $41,000, which, of course, he has not yet received. There was no reason for him to suppose that Miller and Marshall were not authorized agents and officers of Phoenix and fully empowered to do what they did. In this regard let us explore the status of Miller and of Marshall a little further.
The following is quoted from the opinion of Northrop, J., in Phoenix Savings and Loan, Inc., (the new Phoenix) v. Aetna Casualty and Surety Co., 266 F. Supp. 465, 468 (D.C. Md. 1966):
"Plaintiff alleges that the relationship of one Albert Miller to Phoenix was as follows:
`In March, 1960, Albert Miller * * * was employed by Phoenix as Mortgage Representative. He alone handled the making of every mortgage loan made by Phoenix after that date. On March 18, 1960 Coven, on behalf of Phoenix signed a letter to Miller confirming a conversation between the two that Miller was appointed Mortgage Representative *565 of Phoenix for the Maryland D.C. area. * * * Before Miller was employed by Phoenix no loans had been made; during the period he operated the mortgage department of Phoenix it acquired the total of 375 mortgages * * *. Miller prepared and handled all settlement sheets. Other employees have stated that Miller ran Phoenix during the period he was there  they did what he said and he had his desk in the mortgage department * * *. Miller handled all the mortgage transactions at Phoenix * * *.' (Emphasis added.)"
In respect of the special master's finding that "the payments of $49,620.11 by Phoenix to Miller [KWT KDN] were not authorized by Phoenix" the conclusion reached by Judge Northrop is most interesting:
"Phoenix suggests, however, that there are genuine disputes as to material facts and that the defendant's motion for summary judgment must therefore be denied. One such dispute, urges plaintiff, is whether the corporation had knowledge of the various fraudulent transactions. The court, however, views this issue as a question of law, not of fact. The court concludes, as a matter of law, that the corporation did have knowledge of each and every transaction [including Irismark and KWT KDN]  and of its nature  at the time each transaction occurred." Id. at 469.
The summary judgment entered by Judge Northrop was reversed. Phoenix Savings and Loan, Inc. v. Aetna Casualty & Sur. Co., 381 F.2d 245 (4th Cir.1967). The Court of Appeals did not agree that Aetna had established "clearly and without controversy its affirmative defenses sufficiently to be entitled to summary judgment." The court noted, however, that "Phoenix concede[d] that Coven [president of Phoenix], Marshall and Miller exercised substantial day to day control over some of its operations * * *." (Emphasis supplied.)
It seems to us that Phoenix is resorting to sophistry or else it is incredibly naive when it argues that the endorsement of the checks ($43,950.11 and $5,670) by Lapidus was a sine qua non *566 to the accomplishment of the fraud by Miller and Marshall. These men were in complete and absolute command of the facilities of Phoenix. They could have written and issued checks in any amount to any person, whether or not there was cash in the bank to cover them. They controlled the books of account. They dictated the entries to be made therein. They probably could have issued the same checks to a straw man or to a settlement officer with the same result. Indeed, in these strange circumstances, it is quite likely they could have accomplished the entire deal without checks, making use only of passbooks and journal and ledger entries.
Here follows an excerpt from the testimony of Lapidus:
"Q. I hand you * * * [the $43,950.11 and the $5,670 checks], Mr. Lapidus, and ask if you can tell us how it came about that you endorsed those? A. I was told by Mr. Miller at the time of settlement that these two checks represent the difference between the face value of the mortgages and the amount we were supposed to receive, and this was merely a bookkeeping entry in which this money would be placed in reserve of their Association."
* * *
"Q. Didn't it seem a bit preposterous to you that $49,000 out of a sale, outright sale of mortgages of 50 per cent of their face value, that 40 per cent of that would be written off the books of the corporation as a bad debt? A. No, it was a deferred profit. I had a similar thing with my accountant where he entered an entry like that and he explained it to me that it was deferred profit. He didn't receive that money, and he is holding out, bookkeeping procedure, as deferred profit as a surplus.
"Q. But that's not what Mr. Miller told you. He said this was a bad debt. A. No, he did not say it was a bad debt. I assumed it was a bookkeeping entry to be posted to the reserve; he said this represented the total amount and that the surplus represents a surplus."
The special master shrugged off this testimony by saying *567 that Lapidus "must have realized that the issuance of the extra cheques was not the way to set up a bad debt reserve for the difference between the purchase price and the face of the mortgages purchased." This runs counter not only to the uncontroverted testimony of Lapidus but also to what seems to be accepted, but perhaps not preferred, accounting practice. In the Lapidus brief there are quotations from authorities on accounting in support of his position and he says that, at the hearing on the exceptions to the special master's report, he asked (but was refused) leave of court to produce the testimony of a certified public accountant "that it would be good accounting practice at the time of the purchase of an asset at a discount to issue checks for the full face value of the asset and use the checks representing the difference between the price paid and the face value to establish a reserve for deferred profit." That Phoenix, in its brief, chose not to discuss this point may, perhaps, have some significance. We have found nothing in the record condemning the practice (it must not be supposed that we are approving it) and it does not appear that it was so unusual or so preposterous as to suggest to Lapidus, or to anyone with his limited qualifications (he said he did not deal "too much with bookkeeping"), that there was anything irregular or improper in handing the endorsed checks back to an authorized representative of Phoenix. And, it is a hard fact that the four checks were deposited in an account containing general funds of Phoenix in the same bank on which they were drawn. As far as Lapidus was concerned the "money" was safely back in the hands of Phoenix, which, in effect, is what he was told would happen to it.
Lapidus points out that Phoenix has kept the mortgages. The record suggests that 13 of them have been wiped out by foreclosures of the underlying first mortgages and that 5 had been paid in full after the assignment to Phoenix. That more will be realized is not disputed. Mr. Swain, president since 18 June 1965, thought Phoenix would be fortunate if it could collect as much as 25% of the $86,755.29 due on the mortgages as of August 1966. Interest, of course, is being collected and however unlikely it may seem, it is possible that Phoenix still may realize enough to be made whole. Indeed, had it been able to *568 fend off North Shore and were it to succeed now against Lapidus it could wind up with a profit  a profit which may be assured if ultimately it succeeds against Aetna. Phoenix Savings and Loan, Inc. v. Aetna Casualty & Sur. Co., supra (381 F.2d 245).
Since, as we have said, the special master's findings discussed above are, in our judgment, clearly erroneous, it would seem to follow that the authorities relied upon by him are not applicable here.

III.
Phoenix complains that Lapidus has included in the Record Extract, over its objection, (1) the abstract of a report of Peat, Marwick and Mitchell, (2) material from the Bris Realty proceedings, and (3) an abstract of the memorandum of the Conservator, the report of the special master and the opinion and decree of the court in the North Shore proceedings. Lapidus says that when he sought to obtain the above mentioned material by means of interrogatories Phoenix replied that the "facts are contained in * * * [its] books and records," and that "the volume of such records makes further answer * * * prohibitive as to time and cost," but that it would permit Lapidus "to inspect its books and records relating to this transaction at any time." Lapidus says his counsel spent over 40 hours reviewing the 5 foot stack of records in the clerk's office, culling out the relevant facts. In the circumstances we see little merit in the complaint of Phoenix especially since everything in the record before us is part of a single proceeding in the Circuit Court of Baltimore City, entitled Ex Parte in the Matter of Phoenix Savings and Loan Association, Inc., No. A-41730. In any case it does not seem to us that Phoenix has been prejudiced by its inclusion.
For the reasons stated the order of 1 June 1967 will be reversed and the case will be remanded for the entry of an order conformable with the views expressed in this opinion.
Order reversed. Case remanded for the passage of an order conformable with the views expressed in this opinion. Costs to be paid by the appellee.
NOTES
[1] Eastern Air Lines v. Phoenix, 239 Md. 195, 198, 210 A.2d 515 (1965), contains a full discussion of the details of the reorganization of Phoenix Savings and Loan Association and the mechanics of challenging the validity of certain accounts. Judge (now Chief Judge) Hammond's opinion contains also a reference to that beautiful, mythical bird who, after living for 500 years, was burned on a funeral pyre, and arose from the ashes, young and strong, to live another 500 years.
[2] The North Shore proceedings were not appealed to this Court, the final adjudication therein being Judge Oppenheimer's opinion and decree of June 7, 1962 in the Circuit Court of Baltimore City. The following has been extracted from the Memorandum of the Conservator in that case:

North Shore, through its president, Quarngesser, borrowed $172,500.00 from Phoenix on November 16, 1960.
It appears that in August or September 1960, Dr. Howell King (hereinafter referred to as Dr. King), was in contact with Miller regarding the purchase of a mortgage portfolio by Phoenix. Dr. King knew at this time that Quarngesser needed $150,000.00 for his Florida corporation.
Negotiations with Miller, Marshall and Mac Fields of Phoenix resulted in a letter dated October 20, 1960 addressed to Dr. King. This letter contained the written proposition of Phoenix to make a loan to North Shore in the amount of $201,250.00. The information in this letter was relayed to Quarngesser by Dr. King, and they both agreed it was unsatisfactory. Dr. King made a counter-proposal for a loan of $150,000.00 plus a 15% bonus. This offer was accepted following telephone conversations between Dr. King and persons at Phoenix. Quarngesser was informed of the acceptance of the offer and undertook to settle the loan directly with Miller. On November 14, 1960, Quarngesser, on behalf of North Shore, and Miller, on behalf of Phoenix, signed the loan agreement.
Pursuant to this loan agreement, at settlement on November 16, 1960, Quarngesser was to furnish the following collateral:
a) Deed of Trust on certain property in Baltimore County.
b) 100 shares of the preferred stock of Warner Fruehauf Trailer Company, a Maryland corporation, par value $100 each.
c) 3,193 shares of the common stock of Fruehauf Trailer Company, a Michigan corporation.
In accordance with the loan agreement, on November 16, 1960, Phoenix set up a ledger account for North Shore, and disbursed a total of $74,225.00 to North Shore. $50,000.00 of this amount represented the first installment due North Shore; $22,500.00 represented a 15% bonus to Phoenix; $1,725.00 represented the settlement costs on the loan. The agreement provided for two additional advances to North Shore of $50,000.00 each to be paid on December 16, 1960 and January 16, 1961, respectively. Repayments on the loan were to be made monthly beginning on January 4, 1961 at the rate of $4,500.00 plus interest.
In December of 1960, Quarngesser needed additional cash. He communicated this fact to Dr. King and sought his assistance in getting an acceleration of the last $50,000.00 advance from Phoenix which was not due until January 17, 1961 according to the undertaking of Phoenix.
Dr. King, who had been appointed a director of Phoenix on November 30, 1960, was informed that Phoenix did not have sufficient cash to meet its anticipated Christmas time expenses and also to accelerate the January advance to North Shore. Arrangements were made, with the approval and knowledge of Dr. King, for Miller to obtain a loan from the Palm Springs, California Branch of the Bank of America, using the Fruehauf common stock as collateral. The proceeds of this loan would enable Phoenix to anticipate North Shore's final advance. Thus, on January 5, 1961, a letter was sent to Dr. King and forwarded by him to Quarngesser informing the latter that the transaction would be handled by Miller at Miller's bank in California and that Quarngesser's guaranteed signature must be sent to Miller in Palm Springs, California. This guaranteed signature was sent almost immediately.
Shortly after this, on January 10, 1961, the final advance to North Shore in the amount of $50,000.00 was disbursed by Phoenix. The first repayment by North Shore had been made on the due date, January 4, 1961 in the total amount of $5,218.75.
Prior to June, 1961, several other repayments in varying amounts were made. The propriety of these repayments is not questioned by the Conservator. However, in June, 1961, the Fruehauf common stock was still in California, and had not been returned to Phoenix. Dr. King, who then held powers of attorney from North Shore and Quarngesser, entered into an arrangement whereby in exchange for certain accounts Miller allegedly controlled in Phoenix, which accounts would be credited to North Shore's indebtedness, Miller would be allowed to sell the Fruehauf common stock in California and pay off the Bank of America.
Therefore, pursuant to this agreement, on June 30, 1961, there were credited to North Shore's indebtedness to Phoenix accounts totaling $84,444.68 including the KWT KDN, Inc. account for $26,272.81.
There was a further credit given North Shore in the amount of $17,555.32 representing a refund of a portion of the $22,500.00 bonus paid by North Shore at the time of settlement. Thus, the total credits granted North Shore on June 30, 1961 equaled $102,000.00.
North Shore sought to have the liens on the property in Baltimore County removed by paying its debt in full. "New" Phoenix had refused the tendered payments alleging that they had somehow been defrauded by the deal. Judge Oppenheimer ordered:
"* * * that Albert W. Ward, the Court appointed Conservator of Phoenix Savings and Loan Association, Inc., be and he is hereby directed, upon receipt by him of the sum of Forty-Three Thousand Seven Hundred Twenty-Seven Dollars and Forty-Two Cents ($43,727.42), with interest thereon from July 19, 1961 until paid, execute a complete RELEASE of the DEED OF TRUST * * *" of the land in Baltimore County.