632 F.2d 271
 James MARTIN, Appellee,
v.
PILOT INDUSTRIES, d/b/a Pro System, Inc. and Professional
Auto Clean Systems; Arthur L. Crider, Jr., individually and
as President of Pilot Industries, Inc.; Robert S. Hartzog,
individually and as President of Pro System, Inc., Appellants,
and
Pro System, Inc., d/b/a Professional Auto Clean Systems;
Professional Auto Clean Systems, Defendants.
 No. 79-1762.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1980.
Decided Sept. 4, 1980.
 
 Ronald A. Matamoros, Winston Salem, N. C. (Clyde C. Randolph, Jr., House, Blanco & Randolph, P.A., Winston Salem, N. C., on brief), for appellants.
 B. Ervin Brown, II, Winston Salem, N. C. (Stephens, Peed & Brown, Winston Salem, N. C., on brief), for appellee.
 Before WINTER, Circuit Judge, HARRY PHILLIPS, Senior Circuit Judge, Sixth Judicial Circuit, sitting by designation, and PHILLIPS, Circuit Judge.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 On their appeal in this diversity case under North Carolina law, defendants challenge the district court's determination by summary judgment that both the corporate defendant, Pilot Industries, Inc., and the individual defendants, Crider and Hartzog, failed to comply with North Carolina's Business Opportunity Sales Act, N.C.Gen.Stat. §§ 66-94 to -100, when they sold a business franchise to plaintiff James Martin. Concluding that the district court properly found the corporation to have violated the Act, we affirm that part of the district court's judgment which imposed liability on Pilot Industries. We conclude, however, that the evidence adduced by plaintiff in support of his motion for summary judgment was insufficient to support the imposition of liability against the individual defendants.
 
 
 2
 * Upon the summary judgment record we review, these undisputed material facts appear. In 1978, Pilot Industries, a South Carolina corporation, placed an advertisement in a Winston-Salem, North Carolina, newspaper, which read in part:
 
 PROFESSIONAL AUTO CLEAN SYSTEMS
 
 3
 If you are interested in owning your own profitable business we would like to talk to you. We're the people that provide a unique system for the professional clean-up and detailing of cars, trucks, and boats for new and used car dealers, fleets and individuals. We furnish a complete turn-key system including all specialized equipment, complete factory training and establishing of your accounts. We offer the opportunity for you to become financially independent with this program. If you're willing to work you'll be amazed at how successful your business will be in just a short time. Part-time earnings of $12,000 to $15,000 per year and full time earnings of $30,000 to $40,000 per year are projected with our program. An investment of $8,500 to $12,500 depending on size and location of territory is required.
 
 
 4
 Martin responded to the advertisement and received promotional literature that made certain representations about potential profit, for example:
 
 
 5
 GROSS SALES-The PRO System policy is to issue franchises only for locations which have been researched to insure minimum gross sales of $72,000 per year.
 
 
 6
 PROFIT-It is PRO System's policy to survey, analyze and install each franchise operation to net 40 to 45% profit, before taxes, for the franchisee. Based on experience already gained and criteria established, if there are reasonable doubts about achievement, the proposed site and offer will be rejected.
 
 
 7
 The promotional materials made various claims about the training program, referred to the expected "substantial profit," and stated that the "complete set of tested practices and procedures . . . virtually makes your business into an exclusive money machine." Defendants also sent Martin a "profit projection" for the first year of operation which showed a projected net income of $25,670. In April 1978, Martin contracted with Pilot to operate a franchise in Forsyth County, North Carolina. The contract contained an exclusionary clause stating that "no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect." Martin paid Pilot $12,000 at the time the contract was signed. In a "disclosure document" given to Martin prior to the signing of the contract and attached to it, Pilot expressly disavowed any guarantee of profit. Martin gave notice to Pilot that the contract was void and unsuccessfully demanded return of the $12,000.
 
 
 8
 Martin then brought suit alleging that defendants had violated both the Business Opportunity Sales Act and North Carolina's deceptive trade practices statute, N.C.Gen.Stat. § 75-1.1, and had breached the contract. Martin moved for summary judgment on the Business Opportunity Sales Act claim. The district court granted plaintiff's motion, holding that Pilot and the individual defendants were sellers of a business opportunity as defined by the statute, N.C.Gen.Stat. § 66-94, and, therefore, subject to the Act's requirements; that defendants did not comply with the Act; and that both the corporation and the individual defendants were liable to Martin. The district court awarded Martin $12,172.82[1] under the remedy provision found in § 66-100(a),[2] but declined to award attorneys' fees under § 66-100(b). The district court then determined that there was no just reason for delaying the entry of final judgment on the Business Opportunity Sales Act claim and directed the entry of judgment on that claim as provided for in Fed.R.Civ.P. 54(b).
 
 
 9
 On this appeal defendants contend first, that the district court erred in ruling that, as a matter of law, the Business Opportunity Sales Act applied to the sale of the franchise and second, that, if the Act applied, the court erred in holding that defendants Crider and Hartzog were personally liable for violating the statute.
 
 II
 
 10
 The Business Opportunity Sales Act was enacted by the North Carolina General Assembly in 1977 but has not been interpreted by North Carolina's appellate courts. Under the statute sellers of business opportunities, as defined in N.C.Gen.Stat. § 66-94, are required to make certain disclosures to the prospective buyer, id. § 66-95, to obtain a bond or trust account if certain representations are made to the buyer, id. § 66-96, and to file a disclosure statement with the Secretary of State. The seller may not make representations of the earning potential of the business opportunity "unless the seller has documented data to substantiate the claims," id. § 66-98(1). If the seller uses misleading statements or fails to make required disclosures, the buyer may, within one year of the date of the contract, give written notice to the seller that the contract is void and demand return of all sums paid to the seller. Id. § 66-100(a). Buyers that are "injured by a violation" of the statute may recover damages, including attorneys' fees. Id. § 66-100(b).
 
 
 11
 The critical question is whether defendants were sellers of a business opportunity and thus subject to the Act's requirements. "Business opportunity" is defined in § 66-94 as
 
 
 12
 the sale or lease of any products, equipment, supplies or services which are sold to the purchaser for the purpose of enabling the purchaser to start a business, and in which the seller represents:
 
 
 13
 (1) That the seller will provide locations or assist the purchaser in finding locations for the use or operation of vending machines, racks, display cases or other similar devices, or currency-operated amusement machines or devices, on premises (neither) owned nor leased by the purchaser or seller; or
 
 
 14
 (2) That it will purchase any or all products made, produced, fabricated, grown, bred or modified by the purchaser using in whole or in part, the supplies, services or chattels sold to the purchaser; or
 
 
 15
 (3) The seller guarantees that the purchaser will derive income from the business opportunity which exceeds the price paid for the business opportunity; or that the seller will refund all or part of the price paid for the business opportunity, or repurchase any of the products, equipment, supplies or chattels supplied by the seller, if the purchaser is unsatisfied with the business opportunity; or
 
 
 16
 (4) That upon payment by the purchaser of a fee or sum of money which exceeds fifty dollars ($50.00) to the seller, the seller will provide a sales program or marketing program which will enable the purchaser to derive income from the business opportunity which exceeds the price paid for the business opportunity, provided that this subsection shall not apply to the sale of a marketing program made in conjunction with the licensing of a registered trademark or service mark.
 
 
 17
 Provided, that "business opportunity" does not include the sale of an on-going business when the owner of that business sells and intends to sell only that one business opportunity; nor does it include the not-for-profit sale of sales demonstration equipment, materials, or samples, for a total price of one hundred dollars ($100.00) or less.
 
 
 18
 The district court held that Pilot Industries guaranteed income from the franchise and was, therefore, the seller of a business opportunity as defined in subsection (3).
 
 
 19
 Pilot argues that the representations made no guarantee of profit but instead offered an "opportunity" to make a profit and, therefore, summary judgment should have been granted in defendants' favor on the question of the statute's applicability. In support of its argument Pilot refers to statements in the promotional material that emphasize the necessity of substantial personal effort on the part of the buyer, the exclusionary clause in the contract, and the disclaimer of profit in the disclosure statement. Alternatively, defendants contend that the statements made are ambiguous so that summary judgment for either party was inappropriate. This, they urge, derives from a clear principle applied in contract interpretation cases that the meaning of an ambiguous writing presents an issue of fact that may not be resolved on summary judgment. The general principle is sound, see American Fidelity & Casualty Co. v. London & Edinburgh Insurance Co., 354 F.2d 214 (4th Cir. 1965), but it is inapposite here. We think the representations unambiguous in context and summary judgment for Martin appropriate.
 
 
 20
 Summary judgment under Fed.R.Civ.P. 56 should be granted only when it is clear that no issue of fact is involved. Though the evidentiary facts are not disputed, if conflicting inferences could be drawn from those facts, summary judgment cannot be granted. E.g., Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co., 381 F.2d 245, 249 (4th Cir. 1967). Resolution of this issue requires, in the first place, a construction of the meaning of the critical words as they appear in the statute-obviously a question of law; then a determination whether the representations made fall within that meaning, which might or might not present a genuine issue of fact. There is no reason to interpret the words "guarantees" and "income" as used in this statute in other than their ordinary, plain meanings, and there is indeed no suggestion that they should be. It is also apparent to us, as it presumably was to the district court, that under the statute, whether particular representations do guarantee income must be assessed with reference to their objective manifestations rather than to any undisclosed subjective intentions of the person making them. While the objective manifestation of particular words might present a genuine issue of fact due to their intrinsic or contextual ambiguity, we do not think that these do. Here both the express representations made and the context in which they were made are not in dispute, and we agree with the district court that as a matter of law they could convey to a reasonable person situated as was Martin but one impression-that income was being guaranteed. On this basis, summary judgment was appropriately entered. See generally 10 C.Wright & A.Miller, Federal Practice & Procedure § 2725, at 507-16.
 
 
 21
 The representations made by Pilot, particularly the statements concerning gross sales and profits, which are quoted above, are guarantees of income under N.C. Gen.Stat. § 66-94(3). The Act clearly aims to regulate the kind of conduct involved here and to require the seller to document its profit claims. Pilot was, therefore, selling a business opportunity as defined in the Act and had to comply with the Act's requirements. Pilot's contention that the exclusionary clause and the disavowal of profit guarantee removed the sale from the Act's purview is unconvincing. The statute, as noted by the district judge, is not confined to regulating the behavior of the seller at the time the contract of sale is signed. Instead, the Act seeks to regulate precontract dealings as well. When Pilot made the statements concerning the expected profits, which constituted guarantees of income under § 66-94(3), it had to comply at that time with the Act's requirements. Pilot failed to do so by, for example, failing to obtain a bond, id. § 66-96, failing to present a financial disclosure statement to Martin before the signing of the sales contract, id. § 66-95(5), and failing to disclose the number of purchasers that had earned the amounts of income specified in the promotional material, id. § 66-95(10). The profit disclaimer in the statement attached to the contract and the exclusionary clause in the contract did not relieve Pilot from compliance with the statute. When Pilot guaranteed income from the franchise, it came within the statute's scope and had to comply with the Act in its dealings with Martin. Pilot could not then remove the sale of the franchise from the Act's requirements by later disclaiming any guarantee of profit. The purpose of the statute would be thwarted if a seller could avoid its application by making an eleventh hour disclaimer.
 
 
 22
 Because Pilot failed to make the statutorily required disclosures to Martin, Martin was entitled under § 66-100(a) to void the contract and receive all sums paid to Pilot. We therefore affirm the district court's entry of judgment against Pilot Industries.
 
 III
 
 23
 We conclude, however, that the district court erred in granting summary judgment against and imposing personal liability on the individual defendants on the Business Opportunity Sales Act claim. The district court held Crider and Hartzog personally liable on two alternative theories. First, the court noted that Crider and Hartzog were the sole officers, incorporators, and shareholders of Pilot Industries; that Pilot never employed more than three other employees; and that Crider and Hartzog assisted in the preparation of the promotional material. On this evidence the court held that Pilot Industries was the "alter ego" of Crider and Hartzog. Second, the district court invoked the North Carolina rule that corporate officers may be liable for their tortious acts in the conduct of corporate business. We conclude that the evidence forecast for the court on the motion for summary judgment was insufficient to justify the imposition of personal liability on either theory.
 
 
 24
 North Carolina law, of course, recognizes that under some circumstances the corporate entity may properly be disregarded and personal liability imposed on shareholders of whom the corporation is the alter ego. E. g., Henderson v. Security Mortgage & Finance Co., 273 N.C. 253, 160 S.E.2d 39 (1968). However, as noted by the Henderson court, the mere fact that all of the stock of a corporation is owned by one or two shareholders is insufficient to justify attributing corporate acts to the shareholders and imposing personal liability on them. In Henderson the corporation was owned and operated by two people, but the critical factor in the alter ego determination was that, as testified by the corporate president, no effort was made to operate the corporation as an entity separate and distinct from his private interests. Id. at 260, 160 S.E.2d at 44. In order to invoke the alter ego principle, it is thus necessary to demonstrate the presence of other factors justifying disregard of the corporate entity: undercapitalization of the corporation, failure to observe corporate formalities, or such "domination of the finances, policies and practices that the controlled corporation is but a business conduit for its principal." R. Robinson, North Carolina Corporation Law and Practice § 2-12 (2d ed. 1974). See also id. §§ 9-8, -9.
 
 
 25
 As in all contexts, the party moving for summary judgment bears the burden of showing that there "is no genuine issue as to any material fact" and that he is "entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c); see Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Viewing the alter ego theory evidence before the district court in the light most favorable to the individual defendants, we conclude that Martin failed to carry the burden of showing that no genuine issue of fact existed. It was not indisputably shown that defendants so dominated the finances and practices of Pilot Industries that the corporation had no separate existence, see Old Southern Life Insurance Co. v. Bank of North Carolina, 36 N.C.App. 18, 244 S.E.2d 264 (1978), that defendants had ignored corporate formalities, see Henderson v. Security Mortgage & Finance Co., 273 N.C. at 260, 160 S.E.2d at 44, or that the corporation was undercapitalized, see Commonwealth Mutual Fire Insurance Co. v. Edwards, 124 N.C. 116, 120-21, 32 S.E. 404, 405-06 (1899). The imposition of personal liability against the individual defendants, therefore, cannot stand on this theory.
 
 
 26
 The district court also relied on a general rule of state law under which corporate officers may be held personally liable for their tortious acts committed in the course of conducting corporate business. We confess to finding the contours of the rule hazy. A leading commentator on North Carolina corporation law says of the rule that it is "subject to undefined exceptions in some cases where their tortious conduct was committed in good faith for the purpose of advancing the interests of the corporation." R. Robinson, North Carolina Corporation Law and Practice § 13-13 (2d ed.1974). Two North Carolina cases, Minnis v. Sharpe, 198 N.C. 364, 151 S.E. 735 (1930), and Lillian Knitting Mills Co. v. Earle, 237 N.C. 97, 74 S.E.2d 351 (1953), were cited by the district court, without further discussion, as authority for application of the rule to the instant case. We think they do not provide the requisite authority. Whatever the exact scope of the rule, it clearly requires that the elements of an actionable tort be made out. Here the district court expressly ruled out the commission of any intentional tort when in ruling on plaintiff's motion for attorneys' fees it concluded that no willful violation of the Act had occurred. Neither is the statute one of those enacted to protect the public safety whose violation is treated as negligence per se, hence an actionable tort.[3] On appeal, Martin contends that the individual defendants' conduct constituted actionable fraud, but the elements of common law fraud simply cannot be held to have been established as a matter of law on the summary judgment materials before the district court. See Lillian Knitting Mills Co. v. Earle, 237 N.C. at 105, 74 S.E.2d at 356. Accordingly we conclude that summary judgment against the individual defendants on this theory was inappropriate.
 
 
 27
 We conclude, therefore, that the district court erred in granting summary judgment against defendants Crider and Hartzog. It must therefore be vacated, and the action against the individual defendants remanded for further proceedings.
 
 IV
 
 28
 Martin seeks attorneys' fees under N.C.Gen.Stat. § 66-100(b) for the prosecution of this appeal. The district court denied attorneys' fees for prosecution of the proceedings below, and Martin does not contest that denial on appeal. We think the district court's reasoning in denying attorneys' fees applies as well to justify their denial on appeal.
 
 
 29
 Section 66-100(b) provides: "Any purchaser injured by a violation of this Article or by the business opportunity seller's breach of a contract subject to this Article or any obligation arising therefrom may bring an action for recovery of damages, including reasonable attorneys' fees." To be entitled to attorneys' fees, plaintiff must demonstrate "injury." At this stage plaintiff has shown entitlement to the restitutionary remedy found in § 66-100(a), but he has not, at this point, demonstrated compensable "injury." Because the Business Opportunities Sales Act has not been interpreted by the North Carolina courts, the district court relied on the statutory interpretation of similar language found in N.C.Gen.Stat. § 75-16, which grants treble damages to persons "injured" by violations of Chapter 75 of the statutes. In Hardy v. Toler, 288 N.C. 303, 218 S.E.3d 342 (1975), the North Carolina Supreme Court awarded treble damages to the purchaser of a used car that had been misrepresented by defendant-seller. In Taylor v. Triangle Porsche-Audi, Inc., 27 N.C.App. 711, 220 S.E.2d 806 (1975), also involving the sale of an automobile, the court distinguished Hardy and held that plaintiff was not entitled to treble damages because he sought to rescind the contract and recover the purchase price and was, therefore, not injured within the meaning of § 75-16. In Hardy plaintiff elected to retain the automobile and sue for the difference between the real and represented value. Martin, however, like plaintiff in Taylor, seeks to void the contract and recover the purchase price under § 66-100(a) and has not demonstrated "injury" as contemplated in § 66-100(b) that would entitle him to recover attorneys' fees. We think the district court's interpretation, drawing upon the state court's interpretation of a closely related statutory scheme, is soundly based and equally applicable to the claim for fees incident to appeal. They are accordingly denied.
 
 
 30
 AFFIRMED IN PART; VACATED AND REMANDED IN PART.
 
 
 
 [1]
 Martin paid $172.82 in royalty payments to Pilot
 
 
 [2]
 N.C.Gen.Stat. § 66-100(a) provides:
 If a business opportunity seller uses any untrue or misleading statements in the sale of a business opportunity, or fails to give the proper disclosures in the manner required by G.S. 66-95, or fails to deliver the equipment, supplies or product(s) necessary to begin substantial operation of the business within 45 days of the delivery date stated in the business opportunity contract, or if the contract does not comply with the requirements of G.S. 66-99, then, within one year of the date of the contract, upon written notice to seller, the purchaser may void the contract and shall be entitled to receive from the business opportunity seller all sums paid to the business opportunity seller. Upon receipt of such sums, the purchaser shall make available to the seller at purchaser's address or at the places at which they are located at the time notice is given, all product(s), equipment or supplies received by the purchaser. Provided, that purchaser shall not be entitled to unjust enrichment by exercising the remedies provided in this subsection.
 
 
 [3]
 E. g., Ratliff v. Duke Power Co., 268 N.C. 605, 151 S.E.2d 641 (1966). In any event, reliance on a theory of negligence per se would raise a difficult factual issue of causation that could not be resolved on summary judgment motion. See Bell v. Page, 271 N.C. 396, 156 S.E.2d 711 (1967)