**Harry L. HINSON and Bertha J. Hinson, Plaintiffs,**

v.

**OWENS–ILLINOIS, INC., Owens–Corning Fiberglass Corp., The Celotex Corporation, Raymark Industries, Inc., National Gypsum Co., Fibreboard Corporation, Armstrong World Industries, Inc., Nicolet, Inc., Eagle–Picher Industries, Inc., Keene Corporation, Rock Wool Manufacturing Co., Inc., Carey Canada, Inc., Combustion Engineering, Inc., Pittsburgh Corning Corporation, Southern Textile Corp., H.K. Porter, Inc., The Flintkote Co., Empire Asbestos Products, Inc., Atlantic Asbestos Corp., Crown, Cork & Seal Co., Inc., Defendants.**

Civ. A. No. 1:85–3104–15.

United States District Court, D. South Carolina, Aiken Division.

April 30, 1987.

David L. Lyle, Jr., Joseph F. Rice, Blatt & Fales, Barnwell, S.C., for plaintiffs.

R. Bruce Shaw, W. Thomas Causey, Nelson, Mullins, Riley & Scarborough, Columbia, S.C., for defendants.

## ORDER

HAMILTON, District Judge.

This is an asbestosis case arising out of the alleged exposure of the plaintiff, Harry Hinson, to the defendants' asbestos containing products. Bertha J. Hinson is a party to this action by virtue of her asserting a claim for loss of consortium. The matter is presently before the court upon the defendants' motion for summary judgment pursuant to Rule 56, Fed.R.Civ.Proc.

Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

Plaintiffs [1] filed this action in state court on September 24, 1985, alleging that as a result of working with and around the defendants' asbestos containing products, Harry Hinson contracted asbestosis. Mr. Hinson has asserted numerous theories of recovery including, *inter alia*, negligence, strict liability, and breach of warranty. During the period 1953–1976, his employment apparently placed him in positions whereby he may have been exposed to asbestos from the defendants' products, as a result of which exposure, plaintiff claims he contracted asbestosis. Despite his being under medical care since November of 1973, due to difficulty in breathing and chest pains, plaintiff asserts that he first became aware of his asbestosis when he received a definitive diagnosis in August, 1981. Deposition of Hinson, p. 129, 11. 13–16. Plaintiff claims that his cause of action accrued upon his receipt of this diagnosis. After removing the case to federal court, the defendants answered, denying the material averments of the complaint and asserting the statute of limitations as an affirmative defense.

Following conduct of discovery, the defendants, on March 27, 1987, filed the instant motion, and accompanying memorandum of law.[2] The defendants argue that their motion for summary judgment should be granted because the plaintiffs did not file the lawsuit within the limitations period set forth in S.C.Code Ann. §§ 15–3–535 (Law.Co-op.Supp.1986). This statute, in pertinent part, provides that actions "shall be commenced within six years after the person knew or by the exercise of reasonable diligence should have known that he

---

1. Mrs. Hinson's cause of action for loss of consortium is derivative of Mr. Hinson's direct cause of action against the defendants. *Caddel v. Gates,* 284 S.C. 481, 327 S.E.2d 351 (App. 1984). Consequently, because Mr. Hinson's cause of action is barred by the statute of limitations, S.C.Code Ann. § 15–3–535 (Law.Co-op. Supp.1986), Mrs. Hinson's cause of action must also fail. Therefore, although the complaint was filed in the names of both Harry and Bertha Hinson, resolution of the instant motion, as to both parties, requires resolving matters involving only Harry Hinson. For this reason, further reference in this order to the plaintiff (singular) is to be construed as a reference only to Harry Hinson.

2. The defendants filed an "updated memorandum in support of motion for summary judgment based upon the statute of limitations" on March 30, 1987. The plaintiffs responded in opposition to the defendants' motion on April 6, 1987.

had a cause of action." The plaintiffs filed their complaint on September 24, 1985. Therefore, for the plaintiffs' action to be timely, Harry Hinson must neither have known nor by the exercise of reasonable diligence have been able to discover his cause of action against the defendants before September 24, 1979. The defendants, by their memoranda, offer numerous facts which they assert put the plaintiff on notice that he had or by the exercise of reasonable diligence could have discovered that he had a cause of action against the defendants before September 24, 1979.

Plaintiffs' memorandum in opposition denies plaintiff knew of any facts which would have indicated to the plaintiff that he had a cause of action against the defendants. Additionally, as to those facts which by all reasonable inference indicate that plaintiff knew or should have known that he had a cause of action against the defendants prior to September 24, 1979, the plaintiff offers material which attempts to "explain away" their obvious inferences.

After reviewing the entire record in this case, including the pleadings, answers to 16(b) interrogatories and memoranda of law with accompanying depositions and exhibits, and hearing oral arguments thereon, the court is of the opinion that the defendants have met their burden of proof by showing that there is no genuine issue of material fact remaining for trial, that they are entitled to a judgment as a matter of law, and that, therefore, the defendants' motion should be granted for the reasons set out below.[3] Rule 56(c) Fed.R.Civ.Proc., *Phoenix Savs. and Loan v. Aetna,* 381 F.2d 245 (4th Cir.1967).

The "function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition." *Bland v. Norfolk and Southern Railroad,* 406 F.2d 863, 866 (4th Cir.1969). The moving party is entitled to summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Phoenix Savs. and Loan v. Aetna,* 381 F.2d 245 (4th Cir.1967). When ruling "on [a motion for] summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). The plaintiffs argue that "[t]he awarding of summary judgment, though justified in some instances, is a somewhat anticipatory method of resolving a lawsuit." Plaintiffs' Opposition, p. 1. However, the

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just speedy and inexpensive determination of every action.' *Celotex Corp. v. Catrett,* [477] U.S. [317], 106 S.Ct. 2548, 2555 [91 L.Ed. 2d 265] (1986) (citations omitted).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis. *Id.*

With the above guidelines in mind, the court turns to the merits of the defendants' motion.[4]

---

**3.** Oral argument was heard regarding this motion on April 14, 1987. At that hearing, the defendants attempted to introduce a transcript of a recorded interview conducted on March 26, 1982, between Mr. Mack Henry, of Iowa National Insurance Company, and the plaintiff. However, because the plaintiffs were presented this transcript for the first time at the hearing, they objected to its introduction. The court agreed that the plaintiffs would have been unfairly prejudiced by the introduction of this transcript and consequently it has not been considered in granting the motion.

**4.** Aside from memoranda of law, the following materials were offered by the parties to the motion for the court's review: the transcript of a May 10, 1982, recorded interview between

The defendants contend that the plaintiff knew he had suffered an actionable injury due to his exposure to asbestos containing products as early as April 1, 1974. In support of this contention, they offered the following testimony of Dr. Barrett given before the North Carolina Industrial Commission, on January 12, 1983:

Q. Have you at any time during your treatment or examination of Mr. Hinson diagnosed his condition?

A. Well, initially when I first saw him, my impression was pulmonary emphysema and fibrosis. Again, I'm reading from the record.

Q. Have you at any time diagnosed his condition as being asbestosis?

A. When he came back for his report after his examination, all the x-rays and tests were in, I discussed with him—it's so stated here in the record that his pulmonary findings in my opinion were due to his—from his old exposure to asbestos. The term 'asbestosis' was not mentioned. I did not have any proof.

Q. When did you state that to him?

A. The first of April, 1974.

Hearing before the North Carolina Industrial Commission, p. 37, 11. 13–25.

However, as is obvious from this testimony, Dr. Barrett did not have any proof that the plaintiff's pulmonary emphysema and fibrosis were caused by the plaintiff's exposure to asbestos. Therefore, this evidence, viewed in the light most favorable to the plaintiffs, would indicate that plaintiff, in 1974, had no medical proof that his lung condition was due to his exposure to the defendants' products. Consequently, initiation of a lawsuit at this time could have been premature.

Although denying that Dr. Barrett informed him in 1974 of the cause of his ailments, plaintiff admits that in the mid–1970's he had a general familiarity with the dangers of asbestos exposure and knew that asbestos could cause lung conditions. Hearing before the North Carolina Industrial Commission, p. 30, 11. 13–21; Deposition of Hinson, p. 133, 11. 5–14, p. 129, 1. 25—p. 131, 1. 13. Plaintiff also admits that during this time he was aware that he had lung scarring and that his asbestos exposure was the suspect cause. Interview of Hinson on May 10, 1982, p. 3, 11. 4–8.[5] Plaintiff continued to be concerned about his health and these concerns, in part, prompted him to sell his insulation products business in January of 1976. The following statement, given by plaintiff at the May 10, 1982, interview, evidences his motivation in selling his business:

Q. All right now he asked you I believe you said if you could to get away from it, uh, of course I realize this was your vocation, uh but was any uh when he told you this I guess was a year or two before you sold back out to Mr. Beatty, was, is that correct

A. Umm, I'd say possible a year and a half

Q. Before you sold, went out of business, self-employed

A. Yeah, right

Q. Did this have any bearing uh, Dr. Barrett's uh, advice uh, on uh, the fact that you possibly had asbestosis, was that, did that have any bearing on uh, uh, your selling out and going back to Mr. Beatty

Mack Henry and the plaintiff; the transcript of evidence regarding the plaintiff's January 12, 1983, hearing before the North Carolina Industrial Commission; the March 26, 1987, deposition of the plaintiff's physician, Dr. John Barrett; and the February 26, 1987, deposition of the plaintiff. The May 10, 1982, interview was stipulated into the evidentiary record of the January 12, 1983, hearing before the North Carolina Industrial Commission. At the April 14, 1987, hearing on this motion, the plaintiff agreed that this interview transcript was proper-

ly presented to the court and could be considered in ruling on the motion for summary judgment.

5. At his February 26, 1987, deposition, plaintiff reiterated that Dr. Barrett informed him, in the mid–1970's, that he had lung scarring. However, at the 1987 deposition plaintiff could not recall whether the doctor told him the cause of the scarring although plaintiff testified "that's possible." p. 137, 1. 21.

A. Yes, yes, it was not the total factor but it was part of the reason that I did [6]

Post January 1976, plaintiff continued to have breathing difficulties and chest pains, and consequently, he remained under the care of Dr. Barrett. Plaintiff's medical ailments continued and on January 10, 1978, he was admitted to Presbyterian Hospital in Charlotte, North Carolina, in order to "search out the reason or cause for [plaintiff's] persistent pain." Deposition of Dr. Barrett, Exhibit 2, p. 1, l. 1; Hearing before the North Carolina Industrial Commission, p. 23, ll. 10–16. Plaintiff testified that his doctor needed "to see a clearer film as far as their x-rays of whether or not revealed asbestosis." Hearing before the North Carolina Industrial Commission, p. 23, ll. 10–16. While plaintiff was in the hospital, and at his insistence, a heart catherization was performed to determine if heart trouble was the cause of his pain. Id., at ll. 17–21. Shortly thereafter, plaintiff was released from the hospital. Plaintiff's medical record from this [January 10, 1978 through January 13, 1978], hospitalization reveals the following:[7] "This 53 year old white married male insulation firm executive with known chronic lung disease, due to asbestosis has had a chronic cough since 1974 ..., Impression: Asbestosis, both lungs." Deposition of Dr. Barrett, Exhibit 2, p. 1, ll. 1–3, p. 3, l. 16. In addition, plaintiff's discharge summary, dated February 7, 1978, states: "Chest x-ray revealed fibrotic changes in the left lower lobe and middle right lobe [of the lungs]. The patient is re-assured, will continue to be followed on an annual basis for tumor due to his asbestosis and will otherwise return to normal activity. Final Clinical Impression: Asbestosis, both lungs." Id., Exhibit 3, p. 1, ll. 18–19, ll. 30–33. The results of the heart catherization were "essentially normal findings." Id., at l. 29.

Dr. Barrett testified that he discussed the findings recorded in the above reports with plaintiff in January of 1978, pointing out to him that "his lung disease was partially due to asbestos." Deposition of Dr. Barrett, p. 17, ll. 2–23.

Dr. Barrett was not certain he used the term asbestosis during the discussion in January of 1978; however, he was sure he explained to plaintiff that he had scarring in his lungs due to asbestos inhalation. Id., at p. 22, ll. 12–20. Plaintiff does not recall Dr. Barrett informing him of the above. Deposition of Hinson, p. 121, ll. 15–18. On January 29, 1978, very shortly after his release from the hospital, plaintiff received a cat scan of his thorax.[8] Deposition of Hinson, p. 159, ll. 15–22; Deposition of Barrett, p. 22, ll. 1–11. The cat scan showed "undeniably, really asbestosis." Deposition of Barrett, p. 22, l. 8. Plaintiff, however, did not inquire as to the results of the cat scan because, "Dr. Barrett would tell me no change, minor change. I did not have to ask him specific questions." Deposition of Hinson, p. 163, ll. 11–13. Plaintiff continued to be treated by Dr. Barrett and was given cat scans in February of 1979 and 1980.[9] In 1981, plaintiff was x-rayed by the state of North Carolina and in August, 1981, was given a diagnosis of asbestosis. Hearing before the North Carolina Industrial Commission, p. 21, l. 24—p. 22, l. 4; Deposition of Hinson, p. 129, ll. 13–16.

Plaintiffs assert that the definitive diagnosis of asbestosis that Harry Hinson received in August, 1981, should begin the running of the statute of limitations. Viewing the evidence and the inferences to be drawn from the evidence in the light most favorable to the plaintiffs, the court cannot agree with this assertion.

Plaintiff had been under Dr. Barrett's care for respiratory and chest problems since 1974. In the mid–1970's, the plaintiff

---

6. *See also* Hearing before the North Carolina Industrial Commission, p. 33, ll. 17–21.

7. This record was prepared on January 12, and January 14, 1978. Deposition of Dr. Barrett, Exhibit 2, p. 3, ll. 13–14.

8. "Thorax" refers to that part of the body of man and other mammals situated between the neck and the abdomen. *Webster's International Dictionary*, 2380 (3rd Ed.1981).

9. Plaintiff recalls the 1979 cat scan but is unsure if he was given a cat scan in 1980. Deposition of Hinson, p. 159, l. 23—p. 160, l. 5.

had an awareness that exposure to asbestos could cause lung problems, and he knew that his lungs were scarred. Additionally, plaintiff sold his insulation products business to avoid further aggravation of his asbestosis.[10] Then, in January of 1978, plaintiff was admitted to the hospital "to see a clearer film as their x-rays of whether or not revealed asbestosis." Hearing before the North Carolina Industrial Commission, p. 23, ll. 15–16, (Plaintiff's Testimony). The medical report issued after this admission found plaintiff's heart to be essentially normal. He was x-rayed during this January 10, 1978,—January 13, 1978, hospital stay, and the previously discussed medical report and discharge summary clearly indicated a diagnosis of asbestosis. Plaintiff claims that he was not informed of this diagnosis and that he was relieved that his heart was not the source of his pain.

Subsequently, in order to conduct further tests to determine the source of plaintiff's pain, the plaintiff underwent a cat scan on January 29, 1978. This cat scan *positively* revealed asbestosis. In view of the above facts and circumstances and viewing all evidence and inferences therefrom in a light most favorable to the plaintiff, the court concludes that a person of common knowledge and experience would be "on notice that some right of his has been invaded or that some claim against another party might exist", at the very latest, by January 29, 1978. *Snell v. Columbia Gun Exchange, Inc.*, 276 S.C. 301, 278 S.E.2d 333 (1981). Therefore, the statute of limitations in this case began to run at the very latest on January 29, 1978.[11] The plaintiff did not file his lawsuit until September 24, 1985, more than six years from the date plaintiff, by the exercise of reasonable diligence, should have known he had a cause of action against the defendants. Consequently, the defendants are entitled to judgment as a matter of law, and their motion for summary judgment should be granted. Rule 56, Fed.R.Civ.Proc.

Notwithstanding the admissions by the plaintiff and the obvious inferences of the previously recited facts, the plaintiffs argue that a genuine issue of material fact remains for trial. Plaintiff argues that he can shelter himself from the obvious inferences of his testimony by asserting that any answers to questions posed in 1982 are indicative *only* of his knowledge at that time. Hearing before the North Carolina Industrial Commission, p. 24, ll. 4–10; p. 31, ll. 5–8. Plaintiff offers no support for this theory other than his own conclusory assertations.[12]

However, as can be seen from a review of the text of this interview, the questions were worded in a manner that clearly referred to plaintiff's knowledge as it existed in the past. For example, when plaintiff was questioned by Mack Henry on May 10, 1982, the following colloquy took place:

Q. *And at that time* [13] was he thinking and discussing with you though that he thought that the proximate cause of your condition and the fact that you were susceptible to catching these diseases could be from this asbestos

A. *Well that had been borne out before* of course every time I talked to

10. At the April 14, 1987, hearing on this motion, plaintiffs argued that, in 1976, plaintiff's business sold, almost exclusively, fiberglass versus asbestos insulation products. However, regardless of what products plaintiff was selling in his business, his own testimony indicates that his possible asbestosis is "a part of the reason that I did [sell the business]." Interview of Hinson of May 10, 1982, p. 4, l. 8.

11. Even assuming that in order to exercise reasonable diligence plaintiff should be given an extended period to have ascertained the results of this cat scan, no such period could extend until September 24, 1979. The injured party must act with some promptness. *Snell v. Columbia Gun Exchange, Inc.*, 276 S.C. 301, 278 S.E.2d 333 (1981).

12. At his January 12, 1983, hearing before the North Carolina Industrial Commission, plaintiff admitted making the May 10, 1982, statements, and he agreed that the statements were accurate reflections of the interview. Hearing before the North Carolina Industrial Commission, p. 30, ll. 4–7.

13. The phrase "and at that time" refers to the time period around January 1976. See Interview of Hinson of May 10, 1982, p. 3, l. 26—p. 5, l. 15.

him on the telephone or every time in his office, no he didn't point you know re-emphasize that

Q. Yes sir but he had discussed it with you

A. Yes, right

Q. this was probably it

A. Yes

Interview of Hinson of May 10, 1982, p. 5, ll. 2–11 (emphasis added).[14]

Under the circumstances, plaintiff's present effort to rebut the obvious inferences of his earlier testimony represents a single-handed effort to create a general issue of material fact where none exists. In effect, plaintiff is asking the court to determine "which of two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corporation*, 736 F.2d 946, 960 (4th Cir.1984) (citing *Radobenko v. Automated Equipment Co.*, 520 F.2d 540, 544 (9th Cir.1975)). Under such circumstances, a genuine issue of material fact is not created.[15] *Id.*

While the court is cognizant that *Barwick* and its line of supporting precedent deals with situations where a party has attempted to create a genuine issue of material fact by submitting an affidavit that conflicted with earlier deposition testimony, the court finds the rationale underlying those cases to be equally applicable in this case.

In *Radobenko*, the court held that the critical concern on summary judgment is to "separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial." *Radobenko*, 520 F.2d at 544. The ultimate goal is to separate those issues of fact which are "sham issues [and] which should not sub-

ject the defendants to the burden of a trial." *Id.*

In the present case, plaintiff attempts to insulate himself from the obvious inferences of his earlier, predominately 1982, statements and his failure to exercise reasonable diligence. He attempts to do this by either stating he cannot recall, in 1987, conversations with Dr. Barrett which he clearly recalled in 1982, or by directly denying that any such conversations took place. A genuine issue of material fact is not created under these circumstances. *Id.*

Finally, plaintiffs argue that the statute of limitations should not begin to run until the date plaintiff received a definite diagnosis of asbestosis. However, plaintiff's lung scaring was definitely determined to have been caused by asbestos exposure, at the very latest, on January 29, 1978. For the reasons previously delineated, plaintiff, by the exercise of reasonable diligence, should have been aware of his cause of action at that time. To assert that he needs to be informed of a definitive diagnosis, i.e. "a full blown theory of recovery," is contrary to the law of South Carolina. *Snell v. Columbia Gun Exchange*, 276 S.C. 301, 278 S.E.2d 333 (1981). *See also* Annot., 1 A.L.R. 4th 117 § 5 (1978).

For the foregoing reasons and based upon the cited authorities, the court is constrained to conclude that the plaintiffs have not complied with the statute of limitations and therefore, that the defendants' motion for summary judgment should be, and the same hereby is, granted pursuant to Rule 56, Fed.R.Civ.Proc.

---

14. *See also,* Interview of Hinson of May 10, 1982, p. 2, l. 21—p. 3, l. 8, p. 3, ll. 26–31.

15. While it may be argued that plaintiff's present theory does not conflict with his earlier version of the facts, particularly his 1982 statements, a close analysis does not support such an argument. Plaintiff's testimony after 1982 directly disputes the clear meaning of some of the 1982 statements, and he continually denies that

he and Dr. Barrett ever discussed that his medical problems were due to asbestos exposure. This latter position is obviously in direct conflict with statements made in 1982. *See* Hearing before the North Carolina Industrial Commission, p. 29, l. 15, p. 33, l. 8, p. 21, ll. 8–23; Deposition of Hinson, p. 121, ll. 15–18, p. 132, ll. 5–8, p. 134, l. 22, p. 137, l. 22, p. 140, ll. 5–10, p. 143, ll. 4–20, p. 143, l. 23, p. 144, l. 3.